## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |
|---|---|
| WINIFRED MIDKIFF and ARDAITH BROWN, on behalf of themselves and all others similarly situated, | Case No. 3:22-cv-00417-HEH |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR RULE 23 CLASS CERTIFICATION** |
| THE ANTHEM COMPANIES, INC., ANTHEM HEALTH PLANS OF VIRGINIA, INC. d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD, and AMERIGROUP CORPORATION, | |
| Defendants. | |

## <u>INTRODUCTION</u>

Congress designed the Fair Labor Standards Act ("FLSA") to provide the minimum protection to American workers with respect to overtime and minimum wage compensation. 29 U.S.C. § 218(a). The Act specifically states that it does not preclude, and thereby encourages, states to enact their own laws that provide additional or greater advantages to their workers. *Id.* Beginning July 1, 2021, Virginia became such a state providing its workers for the first time with a state law overtime cause of action.

Defendants The Anthem Companies, Inc., Anthem Health Plans of Virginia d/b/a Anthem Blue Cross and Blue Shield, and Amerigroup Corporation, (hereinafter collectively "Anthem" or "Defendants") employed a class of at least 227 Nurse Medical Management ("NMM") reviewers in Virginia during the relevant statutory period, including Named Plaintiff and proposed Class

1

Representative Ardaith Brown.[1] With this motion, Plaintiff Brown requests that the Court certify a class of Anthem's NMMs who worked in the State of Virginia between July 1, 2021, to the present.[2] Plaintiff further requests that the Court appoint her and her Counsel, Nichols Kaster, PLLP and Butler Curwood, PLC, as Class Counsel.

Plaintiff satisfies each requirement of Fed. R. Civ. P. 23. Indeed, a class action makes perfect sense in a case like this where the putative class members all work or worked in the same position in the same state, performing the same utilization review job, under the same compensation plan, subject to the same processes and policies, were all classified as exempt for the same reasons pursuant to the same statutory provisions, are subject to the same exemption defenses, and all seek the same recovery: unpaid overtime wages. For these reasons and those stated further below, Plaintiff Brown respectfully requests that the Court grant this motion.

## PROCEDURAL HISTORY

On June 3, 2022, Plaintiff Winifred Midkiff filed an FLSA collective action lawsuit against The Anthem Companies, Inc. on behalf of herself and all other similarly situated utilization review nurses. (ECF No. 1.) Specifically, Plaintiff Midkiff alleges that Anthem misclassified her and all other utilization review nurses in Virginia as exempt and, as a result, they are entitled to overtime premiums for all of the overtime hours they worked. (*Id*.) Plaintiff Midkiff later amended her the Complaint to include Defendants Anthem Health Plans of Virginia d/b/a Anthem Blue Cross Blue Schield and Amerigroup Corporation. (ECF No. 19.)

On November 10, 2022, the Court conditionally certified an FLSA collective and

---

[1] Named Plaintiff Winifred Midkiff is not a proposed class representative because her employment with Anthem ended in July 2017 before VOWA was enacted. (Srey Decl. ¶ 3.)

[2] The parties agree that this Court has supplemental jurisdiction over Plaintiff Brown's Virginia state law claims. (*See* Sec. Am. Compl. ¶ 8 and Defs.' Ans. to Sec. Am. Compl. ¶ 8.)

authorized notice to issue. (ECF Nos. 43 and 44.) The FLSA notice list included approximately 285 whom Anthem employed from June 3, 2019 to December 1, 2022, the date of when the list was provided to Plaintiffs' Counsel. (Declaration of Rachhana T. Srey ISO Motion for Class Certification ("Srey Decl.") ¶ 4.) Plaintiffs' counsel distributed notice to the putative FLSA Collective members on December 2, 2022. (*Id.* ¶ 5.) The FLSA notice period closed on January 30, 2023. (*Id.*) In addition to Plaintiffs Midkiff and Brown, twenty-four (24) other former and current utilization reviewers joined the FLSA collective as "Opt-in" Plaintiffs, for a total of twenty-six (26) currently included in this case.[3] (*Id.* ¶ 6.)

Plaintiff Midkiff filed a Second Amended Complaint on July 27, 2023, adding Plaintiff Brown as a second Named Plaintiff and proposed class representative of a class of utilization review nurses asserting overtime claims under Virginia state law and pursuant to Fed. R. Civ. P. 23. (ECF No. 85, Sec. Am. Compl.) Plaintiff Brown worked for Anthem from approximately May 29, 2018, to November 19, 2022. (ECF No. 85 ¶ 54; ECF No. 87, Answer to Sec. Am. Compl. ¶ 54.) Anthem claims that they properly classified Plaintiffs and all putative Rule 23 class members as professionally and administratively exempt employees and that they acted in good faith. (*See* Answer to Sec. Am. Compl. at pp. 28-29.)

The parties have served and exchanged written discovery and taken several depositions. (Srey Decl. ¶ 7.) Before the FLSA opt-in period, Anthem served written discovery on Plaintiff Midkiff and select Opt-in Plaintiffs. (*Id.*) After the opt-in period, Anthem served all other Opt-in Plaintiffs with written discovery requests. (*Id.*) Ultimately, the parties agreed to limit depositions to a total of ten (10) Opt-in Plaintiffs including Plaintiff Midkiff with Defendants selecting five of

---

[3] While thirty-four (34) individuals originally consented to join, 8 have since withdrawn their consents. (Srey Decl. ¶ 6.)

the ten and Plaintiffs selecting four. (*Id.* ¶ 8.) Plaintiffs deposed four management level employees, Amanda Williams, Rachel Gresham, Kathleen Dunn, and Shannon Arthur-Rorie, and Anthem's Fed. R. Civ. P. 30(b) corporate designees, Delia Boral and Sharon Robinson. (*Id.* ¶ 9.)

## RELEVANT FACTS

### A.    The Parties.

Named Plaintiffs Midkiff and Brown, the FLSA collective, and the putative Rule 23 class are or were employed by Anthem as utilization review nurses during the relevant statutory period. (Sec. Am. Compl. ¶¶ 51, 54, 74; Answer to Sec. Am. Compl. ¶¶ 51, 54, 74.) As a utilization review nurse, proposed Class Representative Brown's official job title was "Nurse Medical Management ("NMM") I." (Sec. Am. Compl. ¶ 54; Answer Sec. Am. Compl. ¶ 54.)

Defendants are subsidiaries of Anthem, Inc.[4] (Ex. 2, Defs.' Resp. to Pls.' Req. for Admis. No. 27; Answer to Sec. Am. Compl. ¶¶ 11, 13, 19.) Anthem is a multi-line health insurance company providing managed care programs and related services. (Answer to Sec. Am. Compl. ¶ 22.) The Anthem Companies, Inc. operates in multiple states around the country, including Virginia and provides back-office support to other Anthem subsidiaries in areas like payroll and human resources. (*Id.* ¶¶ 29, 31.) Anthem Health Plans of Virginia, Inc. operates under the trade name of Anthem Blue Cross and Blue Shield and along with affiliated blue plans, offers insurance coverage in 14 states around the country. *(Id.* ¶ 15.) Anthem acquired Amerigroup Corporation in approximately 2012 to primarily handle Anthem's Medicaid business.[5] (Ex. 4, Deposition of Rule

---

[4] Anthem, Inc. has since rebranded itself as Elevance Health. (Answer to Sec. Am. Compl. ¶ 14.)
[5] https://www.sec.gov/Archives/edgar/data/1064863/000119312512296755/d379084dex991.htm (last visited Apr. 21, 2023) (announcing WellPoint's (Anthem's predecessor) acquisition of Amerigroup on July 9, 2012). After the acquisition, Amerigroup adopted WellPoint's [Anthem's predecessor company name] job titles and the Utilization Manager RN job title was changed to "Nurse Medical Management." (*See* Ex. 21, Hiring Letter for Utilization Manager RN Position at ANTHEM_MIDKIFF_00001764).

30b(b) Designee Sharon Robinson ("Robinson Dep.") at 17:1-6 (testifying that in the state of Virginia for Medicaid, the contract is between Amerigroup and the Virginia Department of Medical Assistance Services ("DMAS").) As part of Anthem's business of administering health insurance programs, it provides its customers with utilization management, a process by which utilization reviewers process insurance authorization requests submitted by healthcare providers. (Ex. 5, Deposition of Rule 30b(b) Designee Delia Boral ("Boral Dep.") 67:14-18; 68:14-19; Ex. 19, 2020 Utilization Management Program Description at ANTHEM_MIDKIFF_00303435 ("utilization management is a process used to assess the medical necessity, efficiency, and/or appropriateness of health care services in a fair, impartial and consistent manner"); ECF No. 38-3, Julie A. Smith Decl. ¶ 4 (identifying thousands of utilization reviewers employed by Anthem).)

**B.      Plaintiff Brown and the Putative Class Share the Same Primary Job Duty.**

Defendants assign utilization reviewers to a team to process insurance authorization requests submitted by providers on behalf of members covered under a specific health insurance plan. (*See* Boral Dep. 13:6-12; 70:13-24.) There are various types of services for which a provider may request authorization. (*See* Ex. 20, Case Categorization Request Examples (listing types of reviews).) As utilization review nurses, all putative Rule 23 class members' primary job duty is the same as proposed Class Representative Brown's. Like Brown, their primary job duty is to perform utilization reviews, also called "medical necessity" reviews, of authorization requests submitted by healthcare providers. (Defs.' Resp. to Pls.' Req. for Admis. No. 12 (admitting that the primary duty of the Nurse Medical Management I and II is to perform medical necessity reviews, also known as utilization reviews); Defs.' Resp. to Pls.' Req. for Admis. No. 13 (admitting that NMM Is, IIs, and Seniors spend most of their time performing medical necessity reviews); *see also* Robinson Dep. 19:9-19 (corporate representative admitting that the primary

responsibility of a utilization reviewer is to conduct a medical necessity review); Ex. 6, Deposition of Amanda Williams ("Williams Dep.") at 26:8-14, 67:25-68:5 (Brown's immediate supervisor testifying that the primary responsibility of reviewers including Plaintiff Brown is/was to process authorization requests); Ex. 7, Deposition of Kathleen Dunn ("Dunn Dep.") at 49:17-50:4 (manager agreeing utilization reviewers' job is to review clinical information against specific criteria to determine if the criteria is met). Indeed, Anthem has standardized enterprise-wide job descriptions for each level of NMM position that is part of the putative Rule 23 class.[6] (Ex. 22, NMM I Job Description; Ex. 23, NMM II Job Description; Ex. 24, NMM Senior Job Description.)

Utilization review involves determining whether the healthcare provider's submitted documentation meets the applicable objective criteria. (Ex. 25, Approval – Initial Inpatient Review Quick Reference Guide at ANTHEM_LEARING_008768 ("determine if the clinical meets medical necessity for admission approval")[7]; Robinson Dep. 19:9-19 (corporate designee testifying that a utilization reviewer conducts a review by "taking the clinical information that the healthcare provider submits with the authorization request and comparing it to the specific guidelines for that particular review"); Ex. 8, Deposition of Shannon Arthur-Rorie ("Arthur-Rorie Dep.") at 53:25-54:5 (reviewers in the nurse medical management roles are reviewing clinical documentation that's submitted by providers against various criteria used for the review); Ex. 9, Deposition of Aaliyah Price ("Price Dep.") at 74:3-9 (utilization review entailed "looking at the criteria to see if they matched"); Ex. 10, Deposition of Valerie Smith ("Smith Dep.") at 69:22-

---

[6] While Anthem also uses a "Nurse Medical Management Lead" job title, Plaintiff is not including that job title in the putative Rule 23 class.

[7] The parties agreed that several enterprise-level documents produced in related matters, *Canaday v. The Anthem Companies, Inc.*, No. 1:19-cv-01084 (W.D. Tenn.) and *Learing v. The Anthem Companies, Inc., et al.*, No. 0:21-cv-02283 (D. Minn.), may be used here because they are applicable across Anthem entities. (Srey Decl. ¶ 10.)

70:3; 99:3-8 ("you're finding the clinical that matches with the guideline"); Ex. 11, Deposition of

Leanna Olszewski ("Olszewski Dep.") at 54:6-13 ("I would look at the guidelines and see if it fit

in the guidelines"); Ex. 12, Deposition of Yolanda Vines ("Vines Dep.") 107:4-12 ("you would

look up that criteria or the diagnosis, and then see if the patient meets for, you know, matchup

against the – the guideline to see if they met"); Ex. 13, Deposition of Janice Vialpando ("Vialpando

Dep.") at 136:7-24 ("if a specific clinical was listed in Milliman, then I would look for it"); Ex.

14, Deposition of Valendez Gore ("Gore Dep.") at 121:10-19 ("what I did was I matched the

clinicals presented against the guidelines.").)

Importantly, regardless of their assigned division, team, or job title, the type of review

conducted, criteria used for the review, or other duties assigned, a utilization reviewer's primary

job duty is to process insurance authorization requests. (Defs.' Resp. to Pls.' Req. for Admis. Nos.

12-13; *see also* Robinson Dep. 19:9-19; 67:20-68:1 (primary duty does not change based on

criteria or type of review); Ex. 15, Deposition of Rachel Gresham ("Gresham Dep.") at 45:12-21,

73:12-16 (admitting reviewers' primary job is the same regardless of whether review is for an

outpatient procedure, an inpatient hospital stay, or durable medical equipment, or if the governing

criteria for the review is Anthem Medical Policy, Milliman Care Guidelines, or Anthem's Clinical

Guidelines); Dunn Dep. 49:17-50:4 (agreeing utilization reviewers' job is to review clinical

information against specific criteria to determine if the criteria is met regardless of type of review);

Williams Dep. 67:25-69:6 (reviewers' primary responsibility to process authorizations remained

the same regardless of whether the reviewer worked on a special project or was assigned to provide

training to others); Ex. 16, Deposition of Ardaith Brown Vol. II ("Brown Dep. Vol. II.") at 83:3-

16 (job was the same regardless of criteria or line of business).)

**C.    All Putative Class Members Follow the Same Standard Steps to Process Authorization Requests.**

7

Regardless of the specific type of request they are processing, Anthem commonly requires all of its utilization reviewers to follow a step-by-step process. (*See, e.g.*, Ex. 25; Ex. 26, Approval – Concurrent Review Quick Reference Guide; Williams Dep. 29:22-25 (testifying that there are specific steps to follow for each authorization request); Gresham Dep. 19:22-22:17-23 (explaining the steps of the utilization review process and testifying that there is a "workflow process document" that outlines the utilization review process); Arthur-Rorie Dep. 86:20-87:21 (desktop process documents "will give them, kind of, like, a step-by-step. And it also has what you're – what your documentation should, kind of, look like, what it should include"); Dunn Dep. 38:5-39:1 (describing the basic steps of medical necessity review and agreeing that the same steps apply whether the request is for acute or post-acute services); Brown Dep Vol. II 28:6-23 ("when it comes to utilization review – it's the same specific process. You're getting information in from a hospital or agency or facility and you're reviewing the information. And you have to compare it to whichever guidelines that you are using to determine if this member's authorization meets for what they are requesting"); 29:3-19.) The utilization review process begins in the same manner— a healthcare provider submits a request for authorization. (Gresham Dep. 19:22-20:2.) The process ends in the same manner—the utilization reviewer sends a communication to the provider informing them as to whether the request is approved or denied. (Williams Dep. 29:22-31:23 (audit tool ensure appropriate approval or denial letter was sent to the provider); Gresham Dep. 19:22-22:23 (determination letter auto-generated and provided to requesting healthcare provider when reviewer enters the decision into ACMP).)

Specifically, if the clinical information submitted by the healthcare provider meets the applicable medical necessity criteria, then reviewer, including Plaintiff and the putative class, can approve the requested benefit or service. (Ex. 25; Ex. 27, Pend to Medical Director – Outpatient

Quick Reference Guide.) If, however, the clinical information submitted by the provider does not meet the criteria or it is unclear whether the criteria is met, then the utilization review process requires reviewers to send (also known as "pend") the review to a Medical Director for their review and determination. (Ex. 25 at ANTHEM_LEARING_008768 ("if request does not meet medical necessity, STOP and refer to: Pend to MD –Initial Inpatient Review Quick Reference Guide"); Williams Dep. 51:18-25; Arthur-Rorie Dep. 54:6-17.) No utilization reviewers can deny an authorization request. (*See* Ex. 28, Utilization Management Operational Guideline at ANTHEM_MIDKIFF_00325858 ("All UM denials, based on medical necessity or clinical appropriateness, are made by licensed physicians (or appropriate practitioners), as appropriate to the scope of their expertise and training"); Ex. 29, Government Business Division Policies and Procedures, Associates Performing Utilization Reviews – Core Process at ANTHEM_CANADAY_00022248 ("all inpatient and outpatient Utilization Management (UM) denials, based on medical necessity  or clinical appropriateness, are made by licensed physicians"); Boral Dep. 20:10-21 (nurses cannot deny a request).)

In processing requests, utilization reviewers must apply the criteria to reach a correct determination – they do not have authority to deviate from the criteria or use their own judgment to decide whether a review should be approved. (Ex. 30, Email Re: Debrief 12.2.2020 Right Sizing Hours Q&A at ANTHEM_MIDKIFF_00044938 ("authorization review department…must follow strict criteria"); Boral Dep. 119:16-120:15 (corporate representative testifying "it would be an error" for the reviewer to approve a request based on medical judgment where the criteria required the request to be denied because "they have to make a decision based on the criteria"); Arthur-Rorie Dep. 17:18-18:3 (testifying that there is a right and wrong answer, a correct and incorrect determination); Ex. 17, Deposition of Pamela Hackett ("Hackett Dep.") at 122:10-23 ("even if you

have clinical judgment, it's not something that you can use to make a determination…in reviewing

cases with Anthem, it's – it's black and white."); 27:25-28:11 ("I would not say discretion. I had a

steadfast set of rules that I needed to apply to whatever the request was, and I had to follow those

rules"); Gore Dep. 158:16-24 ("it was cookie-cutter. It either met the requirements or it didn't. It

didn't allow for any real delving into the nursing aspect of it."); Price Dep. 65:7-12 ("I was trained

to follow the guidelines to approve cases or send them to the medical director"); Smith Dep. 84:7-

23 ("you're not encouraged to make your own decisions about the cases"); Olszewski Dep. 72:3-

25 ("they're pretty specific as far as – there's no room for interpretation"); 77:15-25 ("the

guidelines are black and white"); Brown Dep. Vol. 1, 92:7-16 ("my clinical judgment, when I think

of it, is more or less from the treatment when I worked in the hospital versus now is completely

different"); 94:16-18 ("I'm using the guidelines").) Which criteria or guideline to use for an

authorization request depends on what is being requested and a specific hierarchy of guidelines.

(Ex. 31, Clinical Review Hierarchy; Gresham Dep. 39:18-40:25 ("there's actually a hierarchy of

criteria that the nurses have to use to be able to do their clinical reviews").) For example, a request

may be processed using federal and state Medicaid guidelines, Milliman Care Guidelines

("MCG"), Interqual, Anthem Guidelines, Amerigroup Medical Policies, Amerigroup Clinical UM

Guidelines, or Amerigroup Clinical Appropriateness Guidelines. (Ex. 32, Utilization and Case

Management Program Annual Evaluation at ANTHEM_MIDKIFF_00010037 (list of criteria used

by Virginia reviewers); Ex. 33, Medical Policy & Clinical UM Guideline Site Navigation at

ANTHEM_MIDKIFF_00163419 ("medical policies are used by all plans and lines of business");

Ex. 32 at ANTHEM_MIDKIFF_00010085 (Anthem Virginia's Medical Policies are used as the

primary guidelines/criteria for all markets for precertification, while MCG is used as the primary

guidelines/criteria for all markets for concurrent review"); *see also* Boral Dep. 24:10-14 (clinical

guidelines and medical policy are used enterprise-wide at Anthem).)

**D.    All Putative Class Members Acquired the Knowledge Necessary to Process Authorization Requests Through Anthem's Training.**

Neither Plaintiff nor the putative class learned how to process insurance authorization requests in nursing school. (Ex. 16, Deposition of Ardaith Brown Volume I ("Brown Dep. Vol. I") at 47:12-18 (nursing school focuses on the treatment of patients); 122:14-123:14 ("you don't necessarily have to have a registered nursing license or licensed practical nurse to do it because we don't learn that in school"); Vialpando Dep. 167:10-168:3 (no courses in nursing school on utilization review, rather nursing school courses focused on treating patients); Gore Dep. 160:15-161:13 (did not learn how to do utilization reviews in nursing school).) Rather, Plaintiff Brown and the putative class acquired the knowledge necessary to process requests through Anthem's robust corporate and on-the-job training. (Ex. 34, Anthem UM Services, Inc., Orientation and Training Overview; Ex. 35, Utilization Management Operational Guideline - Orientation, Training, and Oversight for Health Care Professionals and Non-Clinical Associates at ANTHEM_MIDKIFF_00327015 (four weeks of corporate training minimum, including training on "utilization management processes and applicable accreditation standards," "system operations," "workflow," and "use of clinical review criteria"); *see also* Boral Dep. 62:3-10 (utilization reviewers without an RN education learned how to do all types of review through on-the-job experience); Smith Dep. 73:7-12 ("anyone could be trained in the processes"); Ex. 18, Deposition of Carolyn Seaborne ("Seaborne Dep.") at 36:17-37:6 ("when I went into Anthem, I had absolutely no background in medical management, so being a utilization review nurse was new and it required computer training as well as training using the MCG and the different systems").)

Anthem commonly trains all new reviewers on how to use the criteria to process

authorization requests, how to use the relevant processing systems, and about the insurance products that Anthem offers.[8] (*See* Williams Dep. 40:2-25; 41:13-23; Boral 90:12-94:3 (describing new hire training, including a four-week systems training and training with a preceptor for at least 30 days); Dunn Dep. 56:4-12 (training "is systems-based and criteria-based, process-based"); *see also* Ex. 36, UM Clinician Medical Policy and AIM Diagnostic Clinical Guidelines (training module on medical policies and clinical guidelines); Ex. 37, Products Training (training on insurance products offered).) Anthem commonly requires new utilization reviewers practice their authorization skills by processing mock authorization requests and pairs them with a preceptor who shows them how to process requests. (Williams Dep. 61:4-6; Gresham Dep. 74:9-80:24.)

**E.    All Putative Class Members are Subject to Common Utilization Review Standards.**

Plaintiff and the putative class members are all subject to the same common uniform standards governing utilization reviews set by National Committee for Quality Assurance ("NCQA"), a national accrediting organization. (Ex. 38, NCQA 2020 Utilization Management Standards and Elements.) The NCQA standards cover various aspects of a utilization management program, including structure, clinical criteria, qualifications of review professionals, timeliness of decisions, documentation of reviews, consistency of reviews, and communication of review decisions, among other areas. (*Id*.) NCQA requires that Anthem reviewers use "objective and evidence-based criteria." (*Id.* at ANTHEM_MIDKIFF_00009769; *see also* Ex. 39, Government Business Division Policies and Procedures, Clinical Criteria for Utilization Management Decisions – Core Process.)

---

[8] All reviewers generally use the same computer system, the Anthem Care Management Platform ("ACMP") to process requests.[8] (Gresham Dep. 17:24-18:8,19:9-13, 70:2-6 (ACMP implemented "to establish that unity across all of [Defendants'] various states, to ensure to the nurses were working within the same system."); Brown Dep. Vol. I 83:10-16 (used FACETS, then ACMP system).)

Consistent with these standards, Anthem has numerous policies, procedures, processes, tools, and resources, relevant to various aspects of the utilization review process. For example, in addition to the hierarchy of criteria discussed above, all reviewers are required to document reviews according to Anthem's documentation standards and follow specific processes for requesting additional information for the review. (Ex. 40, Documentation – Clinical Information and Pending for Medical Director Review Quick Reference Guide; *see also* Ex. 41, Documentation – Clinical Request DOT Tool Quick Reference Guide (outlining process for requesting clinical information needed for medical necessity decision); Ex. 42, CCR Daily Expectations Work Flow – Medicaid Quick Reference Guide at ANTHEM_LEARING_ 008431 (step-by-step process for requesting clinical); *see also* Robinson Dep. 90:1-17 (describing a national standardized process that all Medicaid nurses have to follow and stating "[s]o there are quite a bit of policies, procedures and desktop processes that speak to the overall utilization management process"); Williams Dep. 52:1-13, 54:9-16, 57:23-2 (testifying about an if/then tree detailing how to proceed with different types of requests, desktop processes, and a job aide on how to process an authorization in ACMP).) All putative class members are also subject to NCQA standards and Anthem's contractual obligations regarding specific turnaround times ("TATs") for completing authorization reviews. (Ex. 38, at ANTHEM_MIDKIFF_00009795 (UM 5: Timeliness of UM Decisions); Ex. 43, 2020 AUMSI UM Work Plan at ANTHEM_MIDKIFF_00303501 ("all regions must meet 90% goal for all turnaround time (TAT) metrics").

### F.    All Putative Class Members Are Subject to Common Performance Measures.

All putative Rule 23 class members are commonly evaluated based on their productivity, i.e., how many reviews they conduct. (*See, e.g.*, Ex. 44, Performance Scorecard (scorecard tracking UM productivity); Williams Dep. 17:13-19 (the utilization reviewers she manages must complete

a certain number of requests per day); Gresham Dep. 47:3-23 (same); Arthur-Rorie Dep. 66:5-19 (same); Robinson Dep. 95:1-23 (same); *see also* Brown Dep. Vol. I 82:8-16 (she had to process a certain number of reviews per day).)

Plaintiff and the putative class are all subjects to audits of their reviews. (*See* Ex. 45, Nurse Quality Audit Program (description of Nurse Quality Audit Program for the State of Virginia); Ex. 46, 2020 Utilization Management Program Description at ANTHEM_MIDKIFF_00009927 ("the Performance Improvement and Enhancement ("PIE") Team is responsible for conducting monthly associate-level clinical audits, outcomes reporting and process improvement management activities"); Brown Dep. Vol. I 128:8-17 (manager and team lead conducted audits of reviews).) Audits measure whether reviewers are processing authorizations properly from start to finish. (Ex. 46 at ANTHEM_MIDKIFF_00009927; Williams Dep. 29:17-30:14 (Brown's manager testifying that audits are done "to make sure all of the steps were completed . . .if we have process in place for a particular type of request, that that step was followed to ensure that everything was completed"); Arthur-Rorie Dep. 17:18-23; 69:5-16 (as a manager she audited cases "to ensure they made the correct determination"); Boral Dep. 15:17-25, 17:7-18:22 (as a manager she audited the reviews processed by the reviewers she supervised, "making sure that we're making the right decision"); Smith Dep. 84:7-23 ("quality pulled our cases monthly" and the purposes of the audits was "to take the subjectiveness out of the review"); Gresham Dep. 34:2-35:5 (testifying that the quality team conducts audits to make sure that those who work on the health plan are operating consistently with NCQA standards).)

Audits also evaluate the "consistency with which two or more healthcare professionals involved in UM apply medical necessity criteria in decision making". (Ex. 46 at ANTHEM_MIDKIFF_00009927 (the audit evaluates "appropriate case completion"); Boral Dep.

111:11-112:4 ("if I'm looking at the set of information and I am using the same criteria, I should come to the same decision").) Anthem uniformly expects all reviewers to achieve a score of at least 95% on their audits. (Ex. 47, UM Solutions Forum Meeting Minutes at ANTHEM_MIDKIFF_00138117 ("95% benchmark"); Gresham Dep. 79:13-22 (a 95% score on their quality audits means that they are completing their reviews properly, consistent with the UM process); Williams Dep. 29:14-21 (utilization reviewers must obtain a 95% on audits).)

Finally, Anthem commonly tests all putative class members on their accuracy and consistency in applying the criteria through mandatory Inter-Rater Reliability ("IRR") tests. (Ex. 48, Inter-rater Reliability Assessments Policy at ANTHEM_MIDKIFF_00302256 ("no less than annually we will evaluate the consistency with which…health professionals involved in the utilization review process apply criteria in decision making"); Ex. 46 at ANTHEM_MIDKIFF_00009926; Robinson Dep. 86:16-23 (the IRR test is used "to evaluate the accuracy and consistency of applying criteria").) IRR is defined as the "degree of agreement between two or more Health Care Management (HCM) clinical staff when applying medical necessity criteria on a given service request." (Ex. 49, GBD Policies and Procedures Inter-Rater Reliability (IRR) Assessments at ANTHEM_LEARING_010087.) The IRR test is a NCQA requirement that "promotes, evaluates, and monitors consistent application of medical criteria across the enterprise as utilized in UM functions." (Ex. 38 at ANTHEM_MIDKIFF_00009783 (listing "evaluation of consistency" as a factor for accreditation). The purpose of IRR tests is "to address requirements for improving the quality and consistency of utilization reviews." (Ex. 48 at ANTHEM_MIDKIFF_00302256; *see also* Gresham Dep. 70:12-22; Dunn Dep. 67:17-22; Arthur-Rorie Dep. 72:12-18; Ex. 50, Utilization Management Operational Guideline, Inter-Rater Reliability Assessment (IRRA) for Elevance Health Non-Physician Reviewers.) The goal of IRR

assessment is: (1) knowledge of criteria/guidelines; (2) minimize variation in the application of guidelines; (3) identification of training needs and opportunities; and (4) identification of potential risk due to inconsistency in the application of criteria. (Ex. 32 at ANTHEM_MIDKIFF_00010054.) All utilization reviewers must achieve a 90% score to pass the IRR test. (Ex. 51, IRR Testing FAQs at ANTHEM_MIDKIFF_00106904.)

**G.    None of the Putative Class Members Perform Work Requiring their RN Education.**

Utilization review work is not registered nursing work. *See* Chapter 30 of Title 54.1 Code of Virginia (defining the practice of professional or registered nursing). Plaintiff and putative class members uniformly have no responsibility for patient care, do not treat or provide medical advice or treatment to members, do not provide any nursing care to prevent illnesses or diseases, do not supervise or teach others who provide nursing care, and do not administer medications, or otherwise act in a nursing capacity. (*See* Brown Dep. Vol. I 57:24-11; 126:17-19; Robinson Dep. 107:7-108:10, 107:7-108:10, 109:20-23; Boral Dep. 29:12-16.) In fact, reviewers commonly have little to no interaction with members. (Brown Dep. Vol. I 56:4-10 ("we did not communicate with members"); Williams Dep. 71:11-18; Dunn Dep. 53:1-6.)

As noted above, utilization review work is governed by NCQA's uniform utilization management standards, which set forth the minimum standards for who can process authorization requests and does not mandate that only individuals with RN licensure do so. (Ex. 38 at ANTHEM_MIDKIFF_0009786.) Anthem's internal policy corresponds directly to NCQA's standards. (*See* Ex. 29.) Under these UM standards, the utilization review work that Plaintiff Brown and the putative Rule 23 class members commonly perform may be done by Licensed Practical Nurses ("LPNs") and Licensed Vocational Nurses ("LVNs"). (Ex. 2, Defs.' Resp. to Req. for Admis. Nos. 17-19; Ex. 52, Licensed Utilization Reviewer Job Description.); Ex. 29   at

16

ANTHEM_CANADAY_00022248 ("Medical disciplines that may have the qualifications, education, and/or experience to successfully perform utilization reviews as consistent with state and federal regulations and state contracts [include] Licensed Practical Nurse/Licensed Vocational Nurse (LPN/LVN)"); *see also* Williams Dep. 15:11-17:1; 17:13-18:5; 26:3-23 (both Plaintiff Ardaith Brown (who holds an RN license) and Alana Etienne (an LPN) worked together on her team and have the same primary responsibility of processing authorization requests); Robinson Dep. 63:4-64:1 (testifying about LPNs doing reviews within Anthem); Boral Dep. 61:15-63:1 (Medical Review Specialists, who do not have an RN license, work on the same team as exempt Nurse Medical Management Nurses and perform the same reviews but are classified as nonexempt); Dunn Dep. 30:19-31:24 (LPNs and RNs both work on Medicare outpatient prior authorization team and do the same work); Arthur-Rorie Dep. 22:17-23:11; 54:18-21 (admitting the medical specialist role, which only requires an LPN, performs "the exact same job as the nurse medical management" role on the same team); Vines Dep. 22:5-12; 164:15-165:7 (both LPNs and RNs were hired for utilization review position, did the exact same job, and were able to approve requests that met the relevant criteria).)

Importantly, Plaintiff and putative Rule 23 class members share the same circumscribed level of authority with their LPN counterparts, i.e., both LPN and RN reviewers are authorized to approve requests only if criteria are met and must send the request to an MD if criteria is not met. (Defs.' Answer to Reqs. for Admis. No. 19; Ex. 53, Email re GBD Clinical Connections at ANTHEM_MIDKIFF_00138026 ("Licensed Practical Nurses can also approve not just Registered Nurses"); Williams Dep. 16:11-16, 36:24-37:2 (testifying that the LPNs on her team have Licensed Utilization Review job titles and are independently authorized to approve requests that meet criteria); Dunn Dep. 25:7-20 (LPN utilization reviewers permitted to authorize request when

criteria is met); Arthur-Rorie Dep. 54:18-55-6 (if criteria is met, then reviewer—whether an RN or LPN reviewer—are authorized to approve the request and if not, then are required to send the request to a medical director for determination); Brown Dep. Vol. I 125:18-5 (testifying she knows the LPNs on her team were doing the same work as her).)

### H.    Anthem Uniformly Classifies All Class Members as Exempt, Did Not Track Their Hours Worked, and Denied Them Overtime Pay.

Plaintiff and the putative class commonly work unpaid overtime hours. (*See* Ex. 3, Pls.' Resp. No. 3 to Defs.' First Set of Interrog.) Anthem pays all NMMs a salary, commonly failed to track their hours worked, and classifies them as exempt from the overtime requirements of the FLSA and Virginia state law based solely on job title. (Answer to Sec. Am. Compl. ¶¶ 55-59; Boral Dep. 87:24-88:16; Robinson Dep. 101:9-14, 102:21-103:5.) Anthem did not perform any individual analysis of the reviewer, the type of requests they process, or the type of health insurance plan they conduct reviews for in classifying them all the same. (Boral Dep. 87:24-88:16; Robinson Dep. 102:10-20 ("the decision is made based on the job title, not individual nurse").)

### ARGUMENT

### I.    THE LEGAL FRAMEWORK FOR PLAINTIFF BROWN'S STATE LAW OVERTIME CLAIM FOR UNPAID OVERTIME WAGES.

Plaintiff    Brown    seeks    to    certify    the    following    Rule    23    class    under Virginia state law:

> Any individual who: (1) worked/works in Virginia for Anthem, Inc. (or one of its subsidiaries) in the Nurse Medical Management I, II, and/or Senior job title; (2) was/is paid a salary, (3) was/is treated as exempt from overtime laws, (4) worked/works over forty (40) hours during any week, and (5) was/is primarily responsible for performing medical necessity reviews at any time since July 1, 2021.

Plaintiff and the putative Rule 23 class seek payment for unpaid overtime wages under The Virginia Overtime Wage Act, § 40.1-29.2 ("VOWA"). (Sec. Am. Compl.) VOWA was newly

18

enacted on July 1, 2021, and provides employees in Virginia with a state law right of action to recover overtime premiums for all work performed in excess of 40 hours per week. VOWA was later amended on July 1, 2022, to follow the FLSA and applicable federal regulations.[9]

Anthem defends against Plaintiff Brown's and the proposed Rule 23 class members' claims by asserting two uniform affirmative exemption defenses, the "professional" and "administrative" exemptions. Under the FLSA, employees working in a "bona fide professional capacity" are exempt. 29 U.S.C. § 213(a)(1). To qualify for the professional exemption, an employee must be one (1) who is compensated on a salary basis of not less than $455 per week, and (2) whose primary duty is the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialize knowledge or instruction. 29 C.F.R. § 541.300. The primary duty of the professional exemption contains three components: (a) the employee must perform work requiring advanced knowledge, which includes the consistent exercise of discretion and judgment; (b) the advanced knowledge must come from a field of science or learning; and (3) the advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction. 29 C.F.R. § 541.301(a).[10]

The FLSA also exempts employees who work in a bona fide "administrative" capacity. 29 U.S.C. § 213(a)(1). The regulations specify that to qualify for the administrative exemption, the

---

[9] In their Answer to Plaintiffs' Second Amended Complaint, Defendants contend that "Plaintiff's VOWA claims may not be maintained as a class action under Rule 23 because VOWA expressly requires use of FLSA collective action procedures instead of Rule 23." (ECF No. 87 at 29.) Defendants are wrong. *See Glennon v. Anheuser-Busch, Inc.*, No. 4:21CV141, 2022 WL 18937383, at *4 (E.D. Va. Sept. 22, 2022), motion to certify appeal denied sub nom. *Glennon v. Anheuser-Busch, LLC*, No. 4:21CV141, 2022 WL 18584800 (E.D. Va. Nov. 3, 2022) (denying the defendant's motion to strike Rule 23 class action allegations because the opt-in requirement in VOWA is a procedural mechanism, not part of substantive state law, and thus the opt-out mechanism of Rule 23 applies to the plaintiffs' state law claims).

[10] VOWA adopts to the FLSA's exemptions. *See* Va. Code § 40.1-29.2

employee must be one (1) who is compensated on a salary basis of not less than $455 per week, (2) whose primary duty is "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and (3) whose primary duty includes the exercise of "discretion and judgment" with respect to matters of significance. 29 C.F.R. § 541.200.

As the parties' competing summary judgment motions demonstrate, Rule 23 certification of Plaintiff Brown's state law overtime claim is appropriate because whether Anthem is able to meet its burden to prove that Plaintiff and the putative class members are exempt will be decided by common evidence.

## II.    THIS COURT SHOULD CERTIFY THE STATE LAW CLAIMS.

### A.    Rule 23's Certification Standards.

A major goal of class action litigation is to promote judicial economy and efficiency by "simplify[ing] litigation involving a large number of class members with similar claims." *Devlin v. Scardelletti*, 536 U.S. 1, 10 (2002); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003). The requirements of Rule 23 focus on those goals, requiring a plaintiff to meet the requirements of Rule 23(a) and also one of the conditions outlined in Rule 23(b). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014). Rule 23(a) provides that one or more members of a class may sue as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Rule 23(b) requires common questions of law or fact to predominate over any questions

affecting only individual members, and that a class action to be the superior method for adjudicating the controversy. *Wal-Mart*, 564 U.S. at 362–63.

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Piron v. Gen. Dynamics Info. Tech., Inc.*, No. 3:19CV709, 2022 WL 363958, at *8 (E.D. Va. Feb. 7, 2022) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466, 133 S. Ct. 1184, 185 L.Ed.2d 308 (2013).)

 **B.** **The Proposed Class Satisfy the Requirements of Rule 23(a).**

  **1.** **The Proposed Class Exceeds the Numerosity Requirement and Joinder is Impracticable.**

Fed. R. Civ. P. 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable." There is "[n]o specified number [that] is needed to maintain a class action. Rather, an application of the rule is to be considered in light of the particular circumstances of the case." *Stacy v. Jennmar Corp. of Virginia, Inc.*, No. 1:21CV00015, 2022 WL 1442247, at *4 (W.D. Va. May 6, 2022). "A class consisting of as few as 25 to 30 members raises the presumption that joinder would be impractical." *Calderon v. GEICO Gen. Ins. Co.*, 279 F.R.D. 337, 346 (D. Md. 2012) (citation omitted). "The numerosity requirement is more readily met where a class contains employees suing their present employer," as is the case here. *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 485 (E.D. Cal. 2006). This is because class members may be unwilling to sue their employer individually out of fear of retaliation. *Id.*; *see also Swigart v. Fifth Third Bank*, 288 F.R.D. 177, 183 (S.D. Ohio 2012) (stating that in employment cases that "fear of retaliation is an important consideration in deciding whether joinder is impracticable and thus whether the numerosity requirement is satisfied").

Here, the Rule 23 class consists of at least 227 utilization reviewers who were employed on or after July 1, 2021, when VOWA was enacted. (Srey Decl. ¶ 4.) This number is based off of the FLSA notice list that Anthem provided to Plaintiffs' Counsel on December 1, 2022. (*Id.*) That list captured all utilization review nurses who had been employed with Anthem in Virginia since June 3, 2019 to December 1, 2022, the date of the list's production. (*Id.*) Numerosity is satisfied.

### 2.    The Class Shares Common Questions of Law and Fact.

The commonality requirement of Rule 23(a)(2) requires "questions of law or fact common to the class." A single common question is sufficient, so long as its determination "will resolve an issue that is central to the validity of each one of the claims in one stroke." *EQT Prod. Co.*, 764 F.3d at 360 (quoting *Wal-Mart*, 564 U.S. at 350). What matters is "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (emphasis in original) (quotation omitted). Commonality is evident when the "plaintiff shows that the class members have suffered the same injury," and when the injury arises from "a common contention." *Wal-Mart*, 564 U.S. at 349. The existence of a uniform corporate policy is often sufficient. *EQT Prod. Co.*, 764 F.3d at 366. Moreover, "[c]ommonality is usually satisfied in wage cases where the plaintiffs allege that defendants had a common policy or practice of unlawful labor practices." *Chime v. Peak Sec. Plus, Inc.*, 137 F. Supp. 3d 183, 208 (E.D.N.Y. 2015) (quotation omitted); *see, e.g.*, *Stacy*, 2022 WL 1442247, at *5 (finding commonality satisfied where the answer to question of whether defendants' rounding practice violates Virginia law because hourly employees are not being compensated for all hours actually worked would resolve the claims "in one stroke"); *Roldan v. Bland Landscaping Co.*, Inc., 341 F.R.D. 23, 32 (W.D.N.C. 2022) (finding commonality where all of the putative class members worked in the same position under the same wage policies). "Factual variances among class grievances will not defeat the commonality requirements, so long

as the claims arise from a common nucleus of operative facts." *Nerland v. Caribou Coffee Co., Inc.*, 564 F. Supp. 2d 1010, 1031 (D. Minn. 2007).

Here, Anthem commonly classified its salaried utilization review nurses as professionally and administratively "exempt" from overtime premiums under federal and state wage and hour laws and did not pay them overtime pay for the overtime hours they worked. As Plaintiffs' contemporaneously-filed motion for partial summary judgment demonstrates, Plaintiff Brown and the Rule 23 class members' state law claims rise and fall together. Indeed, Anthem is not claiming that some salaried utilization review nurses are administratively and professionally exempt while others are not. Moreover, all reviewers share the same primary job duty to conduct medical necessity reviews, and were subject to the similar standards, policies and processes including enterprise-wide policies and processes, consistent with national accreditation standards that are critically important to managed care organizations like Anthem. Plaintiff Brown and the putative class are all required to use predetermined, standardized, objective criteria and guidelines to process the authorization requests Anthem assigned them. They were subject to similar circumscribed utilization review processes and steps within the processes. They were provided with the same or substantially similar computer systems, job aides, tools, and resources to do their work. Anthem uniformly tracked all utilization reviewers' productivity, required them to meet specific turn-around times, commonly audited their reviews and subjected them to IRR testing to ensure that they all accurately and consistently applied the objective criteria. As a result, common questions of law and fact exist including but not limited to:

- Whether the reviewers have the primary duty of performing work requiring "advanced knowledge" for purposes of the learned professional exemption;

- Whether the reviewers, whose job is to apply objective criteria to reach a correct determination according to strict policies and procedures, perform work requiring advanced knowledge including the consistent exercise of discretion and judgment for

purposes of the learned professional exemption;

• Whether the actual utilization work itself, which is also primarily performed by reviewers with LPN licenses, meets the requirement that the advanced knowledge is customarily acquired by a prolonged course of specialized instruction for purposes of the professional exemption;

• Whether the reviewers, who are the ones who are doing the actual day-to-day utilization reviews, have the primary duty of performing office or non-manual work directly related to Anthem's management or general business operations or its customers for purposes of the administrative exemption;

• Whether the reviewers, whose job is to apply objective criteria to reach a correct determination according to strict policies and procedures, are exercising discretion and independent judgment with respect to "matters of significance" for purposes of the administrative exemption;

• Whether Anthem failed to keep accurate time records of all hours worked by Plaintiff Brown and the class members; and

• Whether Anthem's failure to pay overtime to Plaintiff Brown and the Rule 23 class was willful and not in good faith.

Because utilization reviewers performed the same primary job duty regardless of their assigned division, team, job title, type of review conducted, criteria used for the review, or other duties assigned, operated under the same or substantially similar policies, procedures, and work processes, were uniformly classified as administratively and professionally exempt, and suffered similar injuries from working over forty hours per week without overtime pay, the answers to these common questions are subject to common proof, as shown by the parties' competing summary judgment requests on Anthem's common defenses.

Finally, courts routinely certify misclassification cases with similar common questions, concluding that the central question—whether the employees were wrongfully classified as exempt from overtime pay (the same question here)—is common to the class. *See, e.g.*, *Calderon*, 279 F.R.D. at 347 (granting certification where all class members suffered the same injury because defendants uniformly classified them all as exempt from overtime provisions of state and federal

law and they shared similar responsibilities and the same primary job tasks); *Myers v. Loomis Armored US, LLC*, No. 3:18-CV-00532, 2019 WL 3338172, at \*5 (W.D.N.C. July 25, 2019) (certifying state law claims where class members' claims arise from the same conduct, defendant's payment practices); *Rehberg v. Flowers Baking Co. of Jamestown, LLC*, 2015 WL 1346125, at \*19 (W.D.N.C. Mar. 24, 2015) (certifying class for misclassification claims ); *see also Prinzo v. Hannaford Bros. Co., LLC*, 343 F.R.D. 250, 252 (D. Mass. 2023) (commonality met because "whether such misclassification had indeed taken place turns on the same factual and legal inquiry: whether their 'primary duty' is the performance of exempt work"); *Ambrosia v. Cogent Commc'ns, Inc.*, 2016 WL 31356, at \*12 (N.D. Cal. Jan. 4, 2016) (certifying class for misclassification claims). This Court should reach the same result.

### 3.    Plaintiff Brown's Claims are Typical of the Class.

Typicality is met if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The typicality requirement ensures that the claims of the class representative are sufficiently aligned with those of the other class members. Typicality is satisfied when the plaintiffs and the class have an interest in prevailing on similar legal claims." *Calderon*, 279 F.R.D. at 346 (finding typicality met where the plaintiffs' claims and class members' claims and the defendants' administrative exemption defense all arose from defendants' decision to classify all of it security investigators as exempt from state and federal overtime laws). "A strong similarity of legal theories satisfies the typicality requirement even if substantial factual differences exist." *Nerland*, 564 F. Supp. 2d at 1031–32 (quotation omitted). Indeed, typicality does not require "that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned" – some minor variation between a named plaintiff's individual claim and those of the class members she aims to represent is to be expected." *Roldan*,

341 F.R.D. at 32–33 (citing *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006).)

Here, proposed Class Representative Brown's claim is identical to class's. She and the putative Rule 23 class have all suffered the same injuries, unpaid overtime wage, stemming from Anthem's uniform misclassification of its salaried utilization reviewers as exempt. *See Stacy*, 2022 WL 1442247, at *4 (finding typicality met where named plaintiffs were members of the class and subclasses, worked the same or similar hours, performed the same or similar duties, and subject to the same allegedly unlawful rounding practice that resulted in unpaid hours in violation of Virginia law suffered the same injury as all putative class members). Further, there are no legitimate defenses that would apply only to Brown and not to other class members. Brown's interests and incentives are aligned with the putative class's, making her claims typical. *See George v. Duke Energy Ret. Cash Balance Plan*, 259 F.R.D. 225, 232 (D.S.C. 2009) ("[T]ypicality . . . tends to merge with . . . commonality and adequacy . . . .") (citation omitted).

### 4.    Class Representative Brown and Her Counsel are Adequate.

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy requires: (1) proposed class representatives must be members of the class they purport to represent and their interests must not be in conflict with those of the other class members; and (2) class counsel must be "qualified, experienced and generally able to conduct the proposed litigation." *Stacy*, 2022 WL 1442247, at *6 (citing *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 338–39 (4th Cir. 1998) and *Messer*, 2019 WL 2550328, at *4 (citation omitted)).

Here, proposed Class Representative Brown satisfies the adequacy prerequisite. She seeks the same legal relief as the class (overtime pay, treble (from July 1, 2021 to June 30, 2022) and liquidated (since July 1, 2022) damages, attorneys' fees and costs). She has participated

significantly in this case, responding to two sets of written discovery, producing documents, and sitting for two depositions. (Srey Decl. ¶ 11.) As Brown testified, she is "more than willing to be a representative for all of [her] fellow plaintiffs who [she] do[es] not know but that are included with this case." (Brown Dep. Vol. II, 58:11-24.) Brown also has retained experienced legal counsel to represent her and the class. Nichols Kaster, PLLP, satisfies the adequacy requirement. They have actively and vigorously pursued the claims in this case, by, among other things, successfully moving for FLSA conditional certification, overseeing the FLSA notice process, and engaging in extensive discovery. Nichols Kaster has extensive experience in class action and wage and hour litigation and is recognized as a leader in wage and hour litigation. (*See generally* Ex. 54, Firm Resume.) As the Court noted *in Netzel v. W. Shore Grp., Inc.*, "other Courts in this District . . . have previously noted that the Nichols Kaster firm is well known for its experience in wage and hour litigation, and the Courts have found the firm competent of representing a class or collective." 2017 WL 1906955, at *6 (D. Minn. May 8, 2017). Additionally, Nichols Kaster has associated with Curwood Butler, PLC, a Richmond, VA firm that is also highly experienced in class and collective litigation, particularly in wage and hour matters.  (*See* Srey Decl. ¶ 12.)

    **C.**    **The Predominance and Superiority Requirements of Rule 23(b)(3) are Satisfied.**

Plaintiff must also satisfy one of the subsections of Rule 23(b), which requires that (1) questions of law or fact common to the class members predominate over individual questions; and (2) the class action is superior to available methods for the fair and efficient adjudication of the controversy. *Piron v. Gen. Dynamics Info. Tech., Inc.*, No. 3:19CV709, 2022 WL 363958, at *7 (E.D. Va. Feb. 7, 2022). In the Fourth Circuit, it is also necessary to demonstrate compliance with a third "implicit" requirement: the proposed class must be readily ascertainable "in reference to

objective criteria." *Id.* (citing *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014)).[11]

       **1.**      **Common Issues Predominate.**

Rule 23(b)(3)'s predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "The predominance inquiry focuses not only on the existence of common questions, but also on how those questions relate to the controversy at the heart of the litigation." *EQT Prod. Co.*, 764 F.3d at 366. This inquiry further turns on whether "the defendants' common conduct is sufficient to ensure the predominance of common issues over individual ones." *Id.* at 367. Predominance compares common and individual questions in a case. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (individual question requires plaintiffs "to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof"). "So long as the overarching issue in a case is common to the class, class certification is still appropriate even if there are some individual issues (e.g., damages) that will need to be resolved." *Piron*, 2022 WL 363958, at *8. Moreover, "[a]n internal policy that treats all employees alike for exemption purposes suggests that the employer believes some degree of homogeneity exists among the employees" and is a factor to consider for predominance. *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009); *see also Stacy*,

---

[11] Plaintiff easily satisfies the ascertainability requirement. As noted above, Anthem produced an FLSA notice list containing the names, home addresses, dates of employment, and job titles of each of the putative FLSA collective members whom it employed from June 3, 2019 to December 1, 2022. (Srey Decl. ¶ 4.) While the Rule 23 notice would differ in temporal scope given that VOWA was not enacted until July 1, 2021, the class is clearly ascertainable from Anthem's internal employment records. *See Roldan v. Bland Landscaping Co., Inc.*, 341 F.R.D. 23, 32 (W.D.N.C. 2022) (finding that the proposed class members are ascertainable where the defendant has already provided a list of current and former putative class members to plaintiff).

2022 WL 1442247, at *6 (predominance met where the defendants' compensation policy affected all putative class members without regard to any factual differences that may have existed).

Here, Anthem has uniformly treated all putative class members alike, classifying them all as exempt based on job title alone, claiming the same exact exemptions apply without regard to any individual reviewer. This misclassification claim is the center of this case, and the exemption analysis drives its resolution. As outlined above, the most important questions relevant to the exemption analysis are common, namely: 1) whether utilization reviewers' primary duty requires the consistent exercise of discretion and judgment within the meaning of the learned professional and administrative exemptions; 2) whether utilization review work that Plaintiff and the putative class performed requires advanced academic instruction; and 3) whether utilization reviewers' primary job duties are "directly related to management policies or general business operations" of Anthem or its customers. Because utilization reviewers share the same primary job duty, were subject to common standards, and performed their jobs in substantially similar ways, these common questions will bind the class and will predominate over any individual issues.[12]

### i.    Professional and Administrative: Whether Utilization Reviewers Consistently Exercised the Requisite Discretion and Judgment.

The "professional" and "administrative" exemptions require an employee to perform work that requires the consistent exercise of discretion and judgment. *See* 29 C.F.R. § 541.301(b); 29 C.F.R. § 541.202(a). The consistent exercise of discretion and judgment is work requiring advanced knowledge. The work has to be predominantly intellectual in character, rather routine.

---

[12] It is well-established that individual damages issues do not defeat certification. *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 428 (4th Cir. 2003) ("[T]he necessity of making an individualized determination of damages for each class member generally does not defeat commonality.").

*See* 29 C.F.R. § 541.301(b). Moreover, "[t]he section 13(a)(1) exemptions are not available, however, for employees who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances". 29 C.F.R. § 704; *see also* 29 C.F.R. § 541.202(e) ("The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources. *See also* § 541.704 regarding use of manuals.").) "The exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a).

Common issues predominate concerning utilization reviewers' ability, or lack thereof, to exercise discretion and judgment in processing insurance authorization requests. Common evidence, including NCQA standards and Anthem's policies regarding audits and IRR testing and Anthem's standardized processes for nearly every aspect of utilization reviews, show that utilization review work is designed to limit discretion and judgment. Indeed, the evidence demonstrates the rigid confines in which Plaintiff and the putative class perform their medical necessity reviews. These standards and corporate policies and processes explain that utilization reviewers are required to use written objective evidence-based criteria, in the sequential order dictated by Anthem, that applying the criteria consistently from one authorization request to the next is of critical import, and that reviewers are prohibited from denying an authorization that does not satisfy criteria. There is a right and wrong answer to every review, and critically, Plaintiff and the putative class are audited and tested on their ability to apply the criteria correctly and consistently to get the answer right. These common facts and policies will show reviewers class-wide did not exercise the requisite discretion and judgment for either exemption to apply.

**ii.    Professional Exemption: Whether Utilization Reviewers' Duties Required Advanced Knowledge in a Field of Science or Learning Customarily Acquired by a Prolonged Course of Specialized Intellectual Instruction**

The learned professional exemption is limited to positions where a standard prerequisite for the job requires specialized academic training.[13] 29 C.F.R. § 541.301(d); *see id.* § 541.301(f) ("When an advanced specialized degree has become a standard requirement for a particular occupation, that occupation may have acquired the characteristics of a learned profession."). Importantly, the relevant focus "in analyzing the availability of the learned professional exemption is on the *minimum requirements* for the job." *Clark v. Centene Co. of Texas*, 44 F. Supp. 3d 674, 679 (W.D. Tex. 2014), *aff'd*, 656 F. App'x 688 (5th Cir. 2016) (emphasis added). As Plaintiffs' motion for partial summary judgment explains, an employer's arbitrary requirements are of no consequence. *See Rego v. Liberty Mutual Managed Care, LLC*, 367 F. Supp. 3d 849, 861–62 (E.D. Wisc. 2019) (finding the de facto requirements necessary to perform job controlling rather than employer's requirements because "the regulations make clear that the learned professional exemption is reserved for professions 'where specialized academic training is a *standard* prerequisite for entrance into the profession'"); *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 206 (2d Cir. 2009) ("If a job does not require knowledge customarily acquired by an advanced educational degree . . . then, regardless of the duties performed, the employee is not an exempt professional under the FLSA."). Given the focus on the position's requirements, and not an individual's own education, "[i]t is [] apparent on its face that this exemption is susceptible to

_____

[13] LVNs and LPNs generally do not satisfy the learned professional exemption because they do not require an advanced degree acquired by a prolonged course of specialized intellectual instruction. *See* 29 C.F.R. § 541.301(e)(2).

common proof." *Kress v. Pricewaterhouse Coopers LP*, Civ. No. S-08-0965, 2013 WL 140102, at *5 (E.D. Cal. Jan. 10, 2013).

Here, as discussed above, common evidence consisting of national utilization management standards and Anthem's employment of reviewers with LPN or LVN licenses whose primary job duty is the same as Plaintiff Brown's and the putative class's demonstrate that the utilization review job itself is not professionally exempt.

### iii.   Administrative Exemption: Common Issues Predominate Whether NMMs' Primary Duty was Related to Defendant's General Business Operations or Management

The administrative exemption requires an employee's primary duty be work "directly related to the management or general business operations" of the employer or its customers.[14] 29 C.F.R. § 541.201(a). This means the employee "must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *Id.* For this requirement of the exemption, "the critical focus is whether an employee's duties involve the running of a business as opposed to the mere day-to-day carrying out of the business's affairs." *Brown v. Serenity C & C, Inc.*, 391 F. Supp. 3d 546, 555 (E.D. Va. 2019) (quoting *Calderon v. GEICO Gen. Ins. Co.,* 809 F.3d 111, 123 (4th Cir. 2015)).

The common proof in this case shows utilization reviewers' primary duty does not directly

---

[14] The Department of Labor's regulations explain that "[w]ork directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities." 29 C.F.R. § 541.201(b).

relate to Anthem or its customers' management or general business operations. As Anthem's corporate and management witnesses testified and standardized policies and procedures show, utilization reviewers are the ones who are providing the very service that Anthem contracted with its customers to provide, i.e., utilization management services. Plaintiff and the putative class conducted their utilization reviews using objective criteria and as production-side employees, were subject to specific productivity goals based on how many reviews they conducted. Plaintiff and the putative class did not work in management and their duties did not include creating Anthem's policies and processes. Class-wide proof will show that the class's uniform primary duty was not related to Anthem or its customers' general business operations or management.

## 2. A Class Action is Superior.

Resolving the VOWA claims as a class is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) lists four superiority factors: (1) the class members' interests in individually controlling the prosecution of separate actions; (2) the extent and nature of other pending litigation about the controversy by members of the class; (3) the desirability of concentrating the litigation in a particular forum; and (4) the likely difficulties in managing a class action. *Stacy*, 2022 WL 1442247, at *7 (quoting Fed. R. Civ. P. 23(b)(3)(A)-(D)).

There is no evidence here that putative class members have any interest in individually pursuing their claims. On the contrary, first, class members may be less apt to individually pursue claims for fear of reprisal and the prospect of individual litigation being cost prohibitive. Second, Plaintiff is not aware of any other lawsuits, either individually or as a class, concerning utilization reviewers' unpaid overtime claims against Anthem other than the related actions that this Court is already familiar with. (*See* ECF No. 69 (Updated Notice of Outcome of Mediation).) Third,

approximately 227 current and former utilization reviewers have worked for Anthem in Virginia since July 1, 2021 when VOWA was enacted, making this forum appropriate to protect their rights. Fourth, the class will be manageable since the same policies and practices applied uniformly to members of the putative class. There are simply no manageability concerns where the central question to each class member's claim is precisely the same. And while Anthem will inevitably focus on the granular details of each class member's employment, such a focus does not negate the fact that Plaintiff and the putative class—regardless of their differences—all similarly had the same primary job duty, were subject to the same or similar policies and procedures, including enterprise-wide policies, and were uniformly classified as exempt based on their job title and without regard to any differences that Anthem may point to. Given this, Plaintiff Brown's and the putative class's claims are most efficiently litigated in a single action. *Roldan*, 341 F.R.D. at 33 (concluding that a class action was superior to other available methods for fairly and efficiently adjudicating the controversy "because all the issues raised by Defendant's pay policies can be resolved here in a single action. Indeed, it is a considerable understatement to say that it would be inefficient to require putative class members to litigate individually").[15]

### D.    The Proposed Notice Meets Rule 23's Requirements and Should be Approved.

Plaintiff Brown's proposed class notice is attached as Exhibit 1. This notice was modeled after the Federal Judicial Center's sample class notice, and is fair, accurate, and informative. The

---

[15] To the extent that Anthem argues that a class action is inferior because some putative class members had an opportunity to join the FLSA, such an argument is irrelevant. *See Calderon v. GEICO Gen. Ins. Co.*, 279 F.R.D. 337, 342 (D. Md. 2012) (noting that "numerous decisions in this district court and other courts within the Fourth Circuit have determined that adjudication of FLSA claims and state wage and hour claims are appropriate and unobjectionable") (citation omitted). "[T]here is considerable logic from a case management standpoint in allowing both actions to proceed in the same case. To do otherwise would not only be inefficient, but also would increase the risk of inconsistent adjudications of claims based on identical facts and arising under parallel federal and state laws." *Id.*

Court should approve the notice and require Anthem to produce a list of all class members within ten (10) days of the Court's order.

## **CONCLUSION**

Proposed Class Representative Brown respectfully requests that the Court (1) certify her Virginia state law overtime claim; (2) appoint her as Class Representative; (3) appoint Nichols Kaster, PLLP and Butler Curwood, PLC as Class Counsel; (4) approve the proposed class notice form; (5) set a 45-day notice period; (6) authorize Class Counsel to mail the Notice at the beginning of the 45-day notice period; and (7) order Anthem to produce a list of all persons who meet the proposed class definition.

DATED: November 30, 2023          **NICHOLS KASTER, PLLP**

/s/ *Rachhana T. Srey*
Rachhana T. Srey, MN Bar No. 340133
H. Clara Coleman, MN Bar No. 0401743
4700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878
srey@nka.com
ccoleman@nka.com

**Attorneys for Plaintiffs, the FLSA Collective, and Rule 23 Class**