## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

WINIFRED MIDKIFF, *et al.*, on behalf
of themselves and all others similarly
situated,

           Plaintiffs,

v.

THE ANTHEM COMPANIES, INC.,
*et al.*,

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

    Civil Action No. 3:22-cv-417–HEH

### <u>MEMORANDUM OPINION</u>
**(Resolving Summary Judgment Motions and Motion to Decertify)**

THIS MATTER is before the Court on a Motion to Decertify the Conditionally

Certified Collective ("Motion to Decertify," ECF No. 105) and a Motion for Summary

Judgment (ECF No. 107), both filed on November 30, 2023, by Defendants The Anthem

Companies, Inc., Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and

Blue Shield, and Amerigroup Corporation (collectively, "Defendants" or "Anthem").

Also before the Court is a Motion for Partial Summary Judgment (ECF No. 97) filed on

November 30, 2023, by Plaintiffs Winifred Midkiff ("Midkiff") and Ardaith Brown, on

behalf of themselves and all others similarly situated (collectively, "Plaintiffs").

Defendants' Motion to Decertify (ECF No. 105) seeks to decertify the

conditionally certified Fair Labor Standards Act ("FLSA" or the "Act") collective,

arguing that the Plaintiffs are not "similarly situated" because they had different clinical

specialties, they worked on different teams, and they applied different guidelines when processing insurance claims.

The cross motions for summary judgment and partial summary judgment each seek a ruling from this Court on whether the Plaintiffs are exempt from the overtime protections in the FLSA and the Virginia Overtime Wage Act ("VOWA") under the learned professional and administrative exemptions, as well as the good faith defense. (ECF Nos. 98, 108). The parties' primary disagreement is whether Plaintiffs' employment duties required the exercise of judgment and discretion. For the reasons that follow, the Court will deny Defendants' Motion to Decertify and Motion for Summary Judgment and the Court will grant in part and deny in part Plaintiffs' Motion for Partial Summary Judgment.

## I. BACKGROUND

### A. Factual Background

Plaintiffs are Registered Nurses ("RNs") who work or worked for Anthem in Virginia as utilization reviewers in one of three positions: Nurse Medical Management ("NMM") I, NMM II, and NMM Senior. (Second Am. Compl. ¶¶ 4, 74; ECF No. 109 ¶ 39.) The primary responsibility of NMMs was "to perform utilization reviews, also called 'medical necessity' reviews, of authorization requests submitted by healthcare providers." (ECF No. 102 at 5.) These utilization reviews required the NMMs to evaluate the authorization requests, determine whether they met certain criteria, and then approve coverage or recommend denial of coverage. (Approval – Initial Inpatient Review Quick Reference Guide at 3, ECF No. 102-26; ECF No. 102 at 4–7.)

2

The NMMs followed a step-by-step process to determine whether the criteria were met, and, if they were, the NMMs could approve the authorization request. (Mar. 18, 2024 Tr. at 91–99, ECF No. 179; *see generally* Approval – Initial Inpatient Review Quick Reference Guide.) If the criteria were not met, the NMMs were required to send the request to a Medical Director (a medical provider such as a physician) for a final determination. (Approval – Initial Inpatient Review Quick Reference Guide at 3; Mar. 18, 2024 Tr. at 91–99.) The NMMs were not permitted to deny any authorization requests themselves. (Utilization Mgmt. Operational Guideline at 1, ECF No. 102-29; Midkiff Dep. at 37–38, ECF No. 109-28.) NMMs of any level could also act as "preceptors," making themselves available to answer questions from NMM trainees. (Mar. 18, 2024 Tr. at 90–91.)

The National Committee for Quality Assurance ("NCQA") sets uniform standards for utilization reviews and Defendants implemented policies to meet those standards. (*See* NCQA 2020 Utilization Mgmt. Standards and Elements, ECF No. 102-39.) Although the NCQA's uniform standards do not dictate that utilization reviewers be RNs, Defendants required NMM Is, NMM IIs, and NMM Seniors to have RN licenses. (NCQA 2020 Utilization Mgmt. Standards and Elements at 19; ECF No. 109 ¶ 36; Defs.' Resp. to Pls.' Req. for Admis. No. 5, ECF No. 102-3.)

Plaintiffs allege that they routinely worked over forty (40) hours per week to complete assigned utilization reviews. (Second Am. Compl. ¶ 5.) However, Plaintiffs did not receive overtime compensation because Defendants classified them as exempt

3

under the FLSA's professional and administrative exemptions—which apply to certain employees whose roles require the use of judgment or discretion. (*See id.* ¶¶ 59–60, 63.)

### B. Evidence on the NMM's Use of Judgment and Discretion

Valendez Gore, an RN and an opt-in member of the collective, testified during a deposition that she had been employed by Anthem as a utilization review nurse in the Nurse Medical Management Department. (Gore Dep. at 7–10, ECF No. 109-36.) She acknowledged that one of the Amerigroup Clinical Appropriateness Guidelines, which she used as part of her role, stated, "In all cases, clinical judgment consistent with the standards of good medical practice should be used when applying the guidelines." (*Id.* at 32.) When asked, "So you used clinical judgment consistent with the standards of good medical practice when you were applying the guidelines?" Gore responded, "Yes." (*Id.*) Gore also indicated that she "worked with the medical directors in interpreting appropriateness of care and accurate claims payments." (*Id.* at 28.) However, she also stated that Anthem's practices would prohibit her from exercising independent clinical judgment. (*Id.* at 32.) For example, while she was permitted to approve authorization requests, she could not deny them. (*Id.*)

During her deposition, Gore was asked about the guidelines that discussed whether a member could complete activities of daily living ("ADLs") and independent ADLs. (*Id.* at 34–35.) These ADLs include tasks such as bathing, dressing, cleaning, and cooking. (*Id.*) Gore explained that "ADL" referred to the task in general and that the term could imply a member required assistance when completing that task. (*Id.*) "Independent ADL" or "IADL" referred to tasks the member could finish without help.

(*Id.*)  When asked how an RN newly hired as an NMM would know whether guidelines related to ADLs and independent ADLs were satisfied, Gore answered that an RN would already know that information due to his or her medical professional background.  (*Id.*)  On a similar note, Gore described learning about pathophysiology in nursing school and stated that this background was important to her utilization review work.  (*Id.* at 43–45.)

Defendants deposed Pamela Hackett, an RN who was employed by Anthem as a utilization reviewer.  (Hackett Dep. at 6–8, 34, ECF No. 109-30.)  When asked whether the guidelines she used required utilization reviewers to exercise clinical judgment, she responded that although "someone on the outside reading it [the guidelines]" would think the guidelines require clinical judgment, the truth is that utilization reviewers cannot use clinical judgment when making determinations.  (*Id.* at 33.)  Hackett testified that "in reviewing cases with Anthem, it's black and white" whether a request complies with the guidelines or not.  (*Id.*)

On September 25, 2023, Plaintiffs deposed Dalia Boral, a corporate representative for Anthem.  (Boral Dep. at 1–2, ECF No. 109-34.)  Boral stated that she is an RN, that she was previously employed as a utilization reviewer with Anthem, and that she was later promoted and became a manager overseeing other nurses who were utilization reviewers.  (*Id.* at 2–5.)  Speaking to how past claims are audited by Anthem, Boral testified that an auditor would review whether, "based on the clinical information, the nurse utilized the correct criteria [a]nd then in using the criteria did they make the right decision to approve."  (*Id.* at 6.)  Boral elaborated:

> So let me just say this: Healthcare is not, I would say, [ ] black and white. So every patient responds or—with progress for their process or condition differently. So the nurse pretty much has to assess based on the clinical information, pull from their knowledge and experience, okay, this is the clinical information. This is the criteria that I have. Based on what I see on my clinical information, does this meet the criteria or do I need to request more information because it's not there.

(*Id.*) When asked whether a nurse is supposed to send the case to a Medical Director if the criteria are not clearly met, Boral answered:

> When it's not clear. It's two things. When they cannot find—when they cannot find what they need in order to approve that, it could be that they may have to request additional information. So, for example, you know, I'm a nurse and I'm looking at this and they wanted specific things and I see that they've never tried this treatment and I'm not seeing it here. So I could request that, depending on the timeline that I have. If not, it would be denied based on what's presented because I just don't have the timeline to ask for additional information that I'm going to have to send it to the medical director because I cannot deny it as a nurse.

(*Id.*)

Boral also testified that while NMMs have a "guide on how to conduct utilization review," that guide "does not replace the fact that [NMMs] are hired as a clinician and we expect them to perform at the top of their license." (*Id.* at 37–38.)

Plaintiff Midkiff was deposed, and she testified that she was an RN employed by Anthem as an NMM. (Midkiff Dep. at 2–4, ECF No. 109-28). Midkiff stated that as an NMM she did not deny request authorizations because she "didn't have any authority." (*Id.* at 37–38.) She testified, "The only thing I was able to do was take the data and plug it into the criteria and a system. And the system said, yes or no. . . . [if] the system said it was approved, then I could give an approval." (*Id.*) Midkiff clarified that "it wasn't my

determination at all. It was purely the system and the Guidelines that we were given to follow." (*Id.*)

On September 29, 2023, Sharon Robinson, a corporate representative for Anthem, was deposed. In 2004, Robinson began as a utilization reviewer, but as of 2023, she was a director of utilization management. (Robinson Dep. at 4–5, ECF No. 119-2.) Robinson testified that the role of a utilization review nurse is to review authorizations against criteria, and that such nurses are audited on this basis. (*Id.* at 22.) Robinson explained that utilization review nurses are audited to evaluate the accuracy and consistency of their reviews. (*Id.* at 22–23.) When asked whether applying the criteria correctly meant that "every review has a right or wrong answer in terms of the correct determination," Robinson responded, "I don't know that I would agree with that." (*Id.* at 24.)

The Court held an evidentiary hearing on March 18, 2024. During that hearing, Plaintiffs called Valerie Smith, an RN employed by Anthem who had served in the roles of NMM I, NMM II, and NMM Senior. (Mar. 18, 2024 Tr. at 89–91.) Smith testified that although she held three different job titles with Anthem, her primary job duties did not change between those roles. (*Id.* at 90.) In each of these roles, Smith's primary responsibility was to "review clinical information and match it against criteria." (*Id.* at 91.) However, Smith explained, "There were certain things you might have to do to move from a I to a II. . . . You might have had to write an article, or something of that nature." (*Id.* at 91.)

Smith testified that she did not learn how to do utilization reviews in either her RN education or her education to become a Licensed Practical Nurse ("LPN"). (*Id.* at 95.)

Instead, she stated that she learned how to conduct these reviews through on-the-job training, which was alone sufficient to prepare her for her job duties at Anthem. (*Id.* at 95–96.) To process a request, Smith explained, NMMs would use a "quick reference guide" which required NMMs to follow a step-by-step procedure. (*Id.* at 98.) NMMs were also trained on a "hierarchy" for when to use different guideline publications, such as "the Milliman or MCG guidelines, Anthem medical guidelines, AIM guidelines." (*Id.* at 99.) If an NMM did not follow the set hierarchy, Smith stated, the NMM "would get audited and you would get points taken off on your audited cases." (*Id.* at 99–100.) Smith testified that NMMs could not use their own judgment to approve a claim. (*Id.* at 101.) If the guidelines were not met, NMMs had no authority to approve the request. They were required to send the case to a Medical Director for a denial review. (*Id.* at 100–01.) According to Smith, if it was unclear whether the clinical data in a request met the appropriate criteria, then the NMM could reach out to a medical provider for more information, seek a team lead to ask questions about the case, or send the case to a Medical Director. (*Id.*)

Dr. John Moore, a pediatrician employed by Anthem, was called by Defendants to testify. (Mar. 18, 2024 Tr. at 181–183.) Dr. Moore stated that he worked for Anthem as a Medical Director and that his role involved reviewing case files completed by NMMs when those nurses did not approve a request for authorization. (*Id.*) Dr. Moore explained that the case files were large—up to 200 pages—and that he "would expect my nurse to use their discretion to distill the information to the relevant parts of it." (*Id.* at 194.) Furthermore, Dr. Moore testified:

> So they would take this extensive file, pull out the relevant information, and then use their best clinical judgment to attach a guideline to it. So the nurse would read the case information, try to find the guideline that was most applicable or the best fit to the clinical situation, review that, make a decision as to whether the clinical criteria were met or not, why they were met or not, and then send their thoughts to me in a way that I could process it that I could understand.

(*Id.* at 184–85.) Dr. Moore stated that during this procedure he expected the NMMs "to use their clinical judgment to find the relevant parts of this case" and he expected that they would be prepared to answer his follow-up questions, if he had any. (*Id.*) He also stated that the NMMs were involved in daily rounds with him or other Medical Directors "to talk over interesting cases, complicated cases, complex social situations. Things that need more attention." (*Id.* at 185.) Dr. Moore testified that the NMMs decided which cases were placed on the agenda to discuss during rounds, and that other cases were discussed during rounds as a matter of Anthem policy. (*Id.* at 185–86.) Occasionally, Dr. Moore testified, an NMM would present a case to him for approval even though the criteria were not met because the NMM felt the member's claim was otherwise deserving of approval. (*Id.* at 186.)

When asked what he looked for in a NMM, Dr. Moore testified, "[W]hat I consider a high quality, highly functioning Nurse Medical Manager is someone who can take the case as it's presented to them and have the clinical experience, the personal experience, the responsibility to see what the meaning behind the case is." (*Id.* at 187.)

When asked whether an NMM's work can be done "by an individual who does not utilize his or her medical background, clinical experience and nursing judgment," Dr. Moore responded, "In my opinion, no, it cannot." (*Id.* at 188.)

9

## C. Procedural History

Plaintiffs filed the original Complaint bringing an FLSA collective action claim against Defendants on June 3, 2022. (*See* Compl., ECF No. 1.) Plaintiffs filed an Amended Complaint (ECF No. 19) on August 24, 2022, and this Court conditionally certified the following FLSA collective on November 10, 2022:

> Any individual who: (1) worked/works in Virginia for the Anthem Companies, Inc. (or one of its subsidiaries) in the Medical Management or Utilization Review Nurse Family, (2) was/is paid a salary, (3) was/is treated as exempt from overtime laws, (4) worked/works over forty (40) hours during any week, and (5) was/is primarily responsible for performing medical necessity reviews at any time since June 3, 2019.

(Order at 1–2, ECF No. 44.) Following the notice period, twenty-six (26) Plaintiffs have opted-in to the collective.

Plaintiffs filed the Second Amended Complaint, which added the Virginia Overtime Wage Act ("VOWA") claim, on July 27, 2023. (Second Am. Compl. ¶¶ 1–3.) Plaintiffs moved to certify a VOWA class on November 30, 2023. (ECF No. 101.) Based on the similar role shared by NMMs and the similar alleged treatment of NMMs by Defendants, the Court granted Plaintiffs' Motion for Rule 23 Class Certification for the following class:

> Any individual who: (1) worked/works in Virginia for Anthem, Inc. (or one of its subsidiaries) in the Nurse Medical Management I, II, and/or Senior job title; (2) was/is paid a salary, (3) was/is treated as exempt from overtime laws, (4) worked/works over forty (40) hours during any week, and (5) was/is primarily responsible for performing medical necessity reviews at any time since July 1, 2021.

(Order entered September 5, 2024, ECF No. 183.)

On September 10, 2024, the Court entered an Order granting the parties' joint motion to stay proceedings pending mediation. (Order, ECF No. 186.) The parties were unable to reach a settlement, and requested an ordering lifting the stay, which the Court granted on November 14, 2024. (ECF No. 188.)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that might affect the outcome of a party's case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hogan v. Beaumont*, 779 F. App'x 164, 166 (4th Cir. 2019). Summary judgment will not lie if there is a dispute of material fact that is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

Under Rule 56(c)(3), "The court need consider only the cited materials, but it may consider other materials in the record." As the Fourth Circuit has stated, a "court may decide a motion for summary judgment without undertaking an independent search of the record." *Arvon v. Liberty Mut. Fire Ins. Co.*, No. 20-1249, 2021 WL 3401258, at *3 (4th Cir. Aug. 4, 2021). At the summary judgment stage, the Court views the facts presented by the evidence, and reasonable inferences therefrom, in the light most favorable to the nonmoving party. *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36

11

F.4th 240, 252 (4th Cir. 2022) (citing *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018)).

## III. ANALYSIS

### A. Defendants' Motion to Decertify the Collective

FLSA "collective actions" are "intended to resolve common issues of law and fact in one proceeding and lower the individual costs of vindicating rights." *Chapman v. Saber Healthcare Grp., LLC*, 623 F. Supp. 3d 664, 671 (E.D. Va. 2022) (citing *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989)). To be part of a collective action, an employee must "opt in" by providing written consent to the court indicating that he intends to join the suit. *Degidio v. Crazy Horse Saloon & Rest. Inc.*, 880 F.3d 135, 143 (4th Cir. 2018).

To proceed as a collective, plaintiffs must demonstrate that they are "similarly situated." 29 U.S.C. § 216(b); *Houston v. URS Corp.*, 591 F. Supp. 2d 827, 831 (E.D. Va. 2008). The FLSA does not define "similarly situated," and the Fourth Circuit has yet to adopt a precise definition of the term. *Andrews v. Bojangles Opco, LLC,* No. 3:23-cv-00593-RJC-DCK, 2024 WL 4154825, at *2 (W.D.N.C. Sept. 11, 2024). In the absence of controlling precedent, district courts have consistently employed a two-step process to determine whether potential plaintiffs are similarly situated. *McNeil v. Faneuil, Inc.*, No. 4:15cv81, 2016 WL 11673836, at *3 (E.D. Va. Mar. 2, 2016).

At the first step, a plaintiff "need only make a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Chapman,* 623 F. Supp. 3d at 672 (internal quotation

12

marks omitted.) On November 10, 2022, the Court found that Plaintiffs met this standard and conditionally certified the FLSA collective.

The second step occurs after discovery is virtually complete, and begins when a defendant files a motion to decertify the collective, as Defendants have done here. *Id.* at 672; ECF No. 105. "At this stage, the court applies a 'heightened fact specific standard' to determine whether plaintiffs are in fact similarly situated." *Chapman,* 623 F. Supp. 3d at 672 (citing *Choimbol v. Fairfield Resorts, Inc.,* 475 F. Supp. 2d 557, 563 (E.D. Va. 2006)). Courts have identified a number of factors to consider at this stage, including "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants that appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Id.; LaFleur v. Dollar Tree Stores, Inc.,* 30 F. Supp. 3d 463, 468 (E.D. Va. 2014) (citation omitted). These factors should be balanced with the fundamental purpose of collective actions, which is to lower costs through the pooling of resources and to limit the controversy to one proceeding to efficiently resolve common issues of law and fact arising from the same illegal activity. *See Hoffmann-La Roche, Inc.,* 493 U.S. at 170.

Plaintiffs "bear the burden of showing by a preponderance of the evidence that their claims are 'similarly situated.'" *Abe v. Virginia Dep't of Env't Quality,* No. 3:20-cv-270, 2021 WL 1845324, at *2 (E.D. Va. Apr. 6, 2021) (quoting *LaFleur,* 30 F. Supp. 3d at 468). District courts have broad discretion in determining whether a collective action is appropriate. *Butler v. DirectSAT USA, LLC,* 47 F. Supp. 3d 300, 306 (D. Md. 2014). If the Court finds that collective plaintiffs are in fact similarly situated, the

collective is certified. *Choimbol*, 475 F. Supp. 2d at 563. At that point, the plaintiffs may present their case at trial based on representative proof. *See LaFleur*, 30 F. Supp. 3d at 473. If the members of the collective are not similarly situated, the collective is decertified, and the plaintiffs may proceed on their claims individually. *Id.*

Defendants argue that Plaintiffs "are 27 nurses across three different divisions and at least eight different teams who, the evidence confirms, handled different medical reviews that called upon the use of different guidelines," and whose duties, hours, and experiences varied. (ECF No. 106 at 5–6.) The fact that Plaintiffs used different guidelines is particularly important here, Defendants contend, because the use of those guidelines could produce disparate results as to liability. In other words, some guidelines may require the use of discretion and judgment, and therefore render nurses using those guidelines exempt from overtime laws, whereas a factfinder may conclude that other guidelines do not require such discretion and judgment, and therefore Plaintiffs who utilize those guidelines would be entitled to relief. (*Id.* at 5–9.)

In response, Plaintiffs argue that the nurses in the collective are "similarly situated" because they each worked for Defendants, they each conducted authorization request reviews, and each of their duties involved reviewing requests against strict guidelines that dictated a certain result. (ECF No. 126 at 18–22.) Plaintiffs also emphasize that a company-wide policy is responsible for classifying Plaintiffs, who are or were NMMs, as FLSA-exempt employees, which shows they were treated similarly by Defendant. (*Id.*) Finally, Plaintiffs argue that even though several different guidelines

were used by different Plaintiffs, the basic job of a utilization reviewer was similar for all Plaintiffs despite variation in the specific guidelines used. (*Id.*)

The Court finds that the Plaintiffs in the collective are similarly situated. All Plaintiffs in the collective held the same type of role for the same employer: each of them are RNs that hold or held utilization reviewer roles for Anthem. All Plaintiffs conducted fundamentally similar work and were all classified as exempt by Defendants. At trial, these common issues of fact will predominate. Minor discrepancies as to job title, the teams under which different Plaintiffs worked, and the specific types of authorization requests reviewed do not significantly disturb the material similarities between the Plaintiffs here. *See LaFleur*, 30 F. Supp. 3d at 468 ("Insubstantial differences in job duties, hours worked and wages due that do not materially affect whether a group of employees may be properly classified are not significant to the 'similarly situated' determination.").

The Court acknowledges that many Plaintiffs used different guidelines, such as federal and state Medicaid guidelines, Milliman Care Guidelines ("MCG"), Anthem Guidelines, and Amerigroup Guidelines. (*See, e.g.*, ECF No. 98 Ex. 33, Medical Policy & Clinical UM Guideline Site Navigation; ECF No. 98 Ex. 34, Utilization and Case Management Program Annual Evaluation 2019; Valerie Smith Dep. at 18, ECF No. 109-32 (stating that utilization reviewers used Milliman guidelines, AIM guidelines, and AmeriGroup Guidelines).) As Defendants argue, the factfinder at trial may be required to review how these separate sets of guidelines were applied and, when an NMM is making a determination, whether some guidelines require the use of judgment or discretion while

others do not. Despite the need for the factfinder to hear evidence on how different types of guidelines were utilized, the Court finds that certifying the FLSA collective is the more efficient option.

Judicial economy is far better served by the factfinder reviewing different sets of guidelines within the confines of one trial where the overall facts about the Defendants, the role of utilization reviewers, and the process of applying guideline criteria to medical records has already been established. In other words, it is a better use of time and resources to tee up all the fundamental facts in one trial and to allow the factfinder to determine which sets of guidelines allow or do not allow Plaintiffs to use judgment or discretion. *See Rehberg v. Flowers Baking Co. of Jamestown, LLC*, No. 3:12-cv-00596-MOC, 2015 WL 1346125, at *17 (W.D.N.C. Mar. 24, 2015) ("The presence of defenses that require individualized inquiries does not necessarily require decertification if common issues and facts predominate . . . .") (citing *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1263 (11th Cir. 2008)). Here, decertifying the collective is the less efficient option as it would require several different trials where the fundamental facts of the case would be unnecessarily re-litigated again and again.

As Plaintiffs note, courts across the Fourth Circuit have relied on similar facts to conclude that a collective should not be decertified. *LaFleur*, 30 F. Supp. 3d at 475 (noting certification of the collective would significantly reduce the costs of litigation to members of the collective); *Epps v. Arise Scaffolding & Equip., Inc.*, No. 2:10-cv-189, 2011 WL 1566004, at *11–12 (E.D. Va. Feb. 17, 2011), *report and recommendation adopted*, No. 2:10-cv-189, 2011 WL 1566001 (E.D. Va. Apr. 22, 2011) (reasoning that a

16

collective action would serve judicial economy given the number of plaintiffs); *Weirton Med. Ctr., Inc. v. QHR Intensive Res., LLC*, No. 5:15-cv-131, 2016 WL 2766650, at *5 (N.D. W. Va. May 12, 2016), *aff'd*, 682 F. App'x 227 (4th Cir. 2017) (finding that fairness and procedural concerns weigh against decertification because a collective action reduces the costs to plaintiffs and allows them to combine their resources).

For the reasons stated, the Court finds that the Plaintiffs in the collective are similarly situated under 29 U.S.C. § 216(b). Consequently, the Court will deny Defendants' Motion to Decertify the Collective.

### B. Cross Motions on Summary Judgment

The parties' cross motions for summary judgment and partial summary judgment each seek a ruling from this Court on whether the Plaintiffs are exempt from the overtime protections in the FLSA and VOWA.[1] (*See* ECF Nos. 98, 108). Whether an employee is exempt from the FLSA's overtime requirements is a mixed question of law and fact. *Williams v. Genex Servs., LLC*, 809 F.3d 103, 109 (4th Cir. 2015). "The question of how the [employees] spent their working time . . . is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law." *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986); *see also Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446, 450 (4th Cir. 2004).

---

[1] Plaintiffs state that their FLSA and VOWA claims are analogous and arguments regarding Anthem's exemption defenses under the FLSA apply equally to the VOWA claims. (ECF No. 98 at 26 n.6 (citing Va. Code § 40.1-29.2).)

As the Supreme Court of the United States held earlier this year, "the preponderance-of-the-evidence standard applies when an employer seeks to show that an employee is exempt from the minimum-wage and overtime-pay provisions of the Fair Labor Standards Act." *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 54 (2025). In addition, FLSA exemptions must not be construed narrowly against an employer but rather must be given a "fair reading." *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 89 (2018).

The Fair Labor Standards Act is codified at 29 U.S.C. §§ 201–219. Section 207 of the Act prohibits employers from requiring employees to work more than forty (40) hours per week unless they are paid at least one and one-half times their regular pay rate. In other words, "the FLSA establishes the general rule that employers must pay overtime compensation to employees who work more than forty hours during a seven-day work week." *Williams*, 809 F.3d at 104.

Employees are entitled to this overtime compensation "unless their employer proves that one of the Act's many exemptions applies." *Id*. Specifically, § 213 states that § 207 "shall not apply with respect to . . . any employee employed in a bona fide executive, administrative, or professional capacity." § 213(a)(1). This statute is the foundation of the learned professional and the administrative exemptions.

### i. The Learned Professional Exemption

The Code of Federal Regulations states that the meaning of a "professional" employee, as described in 29 U.S.C. § 213, is "any employee . . . [w]hose primary duty is performance of work . . . [r]equiring knowledge of an advanced type in a field of

18

science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.300. This exemption is known as the "learned professional exemption." *See Cuttic v. Crozer-Chester Med. Ctr.*, 760 F. Supp. 2d 513, 519 (E.D. Pa. 2011) (citing 29 C.F.R. §§ 541.300–541.301); *Solis v. Washington*, 656 F.3d 1079, 1084 (9th Cir. 2011).

For the learned professional exemption to apply, three elements must be met: (1) "The employee must perform work requiring advanced knowledge;" (2) "The advanced knowledge must be in a field of science or learning;" and (3) "The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a). Clarifying the first element of this test, 29 C.F.R. § 541.301(b) states, "The phrase 'work requiring advanced knowledge' means work which is predominantly intellectual in character, and *which includes work requiring the consistent exercise of discretion and judgment*, as distinguished from performance of routine mental, manual, mechanical or physical work." (Emphasis added.) This involves "us[ing] the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances." 29 C.F.R. § 541.301(b).

Two other regulations are particularly relevant here. Under 29 C.F.R. § 541.302(e)(2), Registered Nurses "generally meet the duties requirements for the learned professional exemption." *See Williams*, 809 F.3d at 106. Second, § 541.704 provides that the learned professional exemption still applies even if the employee uses guidelines or established procedures. Specifically, it states:

> The use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption . . . . [The] exemptions are not available, however, for employees who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances.

29 C.F.R. § 541.704.

In short, for the learned professional exemption to apply, an employer must prove an employee performed "work requiring the consistent exercise of discretion and judgment." 29 C.F.R. § 541.301. Additionally, RNs generally meet this standard, § 541.301(e)(2), and the use of manuals or guidelines does not always preclude exemption, 29 C.F.R. § 541.704.

Here, Plaintiffs' primary duty was to review insurance authorization requests submitted by healthcare providers, determine whether the request and accompanying medical records met the appropriate criteria, and then ultimately approve the request or send it to a Medical Director. The question is whether Plaintiffs exercised judgment and direction in assessing the requests and determining whether the requests should be approved, submitted for denial, or whether additional information was needed. Although the parties each contend that this issue can be resolved in their favor as a matter of law, they both provided voluminous, conflicting evidence on the facts surrounding whether the NMMs exercised judgment and discretion.

To begin, the parties dispute what role, if any, that an NMM's education as an RN plays in his or her work as an NMM. Some evidence shows NMMs relied on their

advanced knowledge as RNs to understand and apply guidelines. (Gore Dep. at 31–34 (acknowledging that NMMs use their RN education when reviewing requests involving ADLs and independent ADLs); Mar. 18, 2024 Tr. at 188 (Dr. Moore stating that an NMM's work cannot be done by an individual who does not utilize his or her medical background, clinical experience, and nursing judgment).) In their interrogatory responses, Plaintiffs Midkiff and Janice Vialpando stated that their "nursing education and clinical experience provided [them] familiarity with common medical terminology found in [their] reviews." (ECF No. 109-39 at 3, 13; *see* Vialpando Dep. at 38–39, ECF No. 109-33 (describing that she learned how to identify an arrhythmia on an EKG strip in nursing school and that she "used nursing skill to apply criteria and guidelines to the facts and information").) Vialpando also testified, "[M]y education as a nurse gave me the clinical insight to understand performing a utilization review." (Vialpando Dep. at 33.) However, Plaintiffs point to other evidence which indicates that an RN education was not needed or not helpful for an NMM's role. (ECF No. 98 at 20–23; Olszekwski Dep. at 15–16, ECF No. 109-37; Gore Dep. at 42 (testifying that she was sufficiently educated to conduct the NMM role prior to her RN education).) For example, Smith testified that it was unnecessary for a utilization reviewer to have an RN's knowledge because everything she needed to perform her role she learned through on-the-job training. (Mar. 18, 2024 Tr. at 95.)

The parties also dispute Plaintiffs' claim that Anthem hires RNs and LPNs for "the exact same job." (ECF Nos. 98, 119.) If it were established that LPNs perform the exact same role as NMMs, and that Anthem was arbitrarily requiring an RN license to exempt

NMMs from overtime, then those facts would tend to show that the learned professional exemption is inapplicable. *Rego v. Liberty Mut. Managed Care, LLC*, 367 F. Supp. 3d 849, 862 (E.D. Wis. 2019) (citing *Pippins v. KPMG, LLP*, 759 F.3d 235, 251 (2d Cir. 2014)). Here, although both parties cite the same bodies of evidence, primarily the depositions of Robinson and Yolanda Vines, the parties disagree on the fact of whether LPNs perform largely the same type of work as NMMs. (Robinson Dep. at 18; Vines Dep. at 2–8, ECF No. 98-32; Boral Dep. at 5, 17; ECF No. 109 ¶¶ 80–81.)

Furthermore, the parties disagree over the nature of the audits Defendants performed. Some evidence shows that Anthem did not allow NMMs to exercise discretion because each request had an objectively correct answer and NMMs were audited to ensure all NMMs were reaching the same, correct result. (Mar. 18, 2024 Tr. at 108–112 (Smith stating that NMMs will have points taken off their audit if they "get something wrong in the review").) However, other evidence shows that the audits were less exacting, and instead merely verified whether NMMs were consistently following the review process, and not that each NMM must reach the same result for a given request. (Robinson Dep. at 24 (disagreeing with the claim that "every review has a right and wrong answer in terms of the correct determination").)

For approving or submitting requests for denial, some evidence indicates, as Plaintiffs contend, that NMMs "cannot deviate from the criteria or use their own judgment in determining whether a request is approved." (ECF No. 98 at 11–12 (citing Midkiff Dep. at 37 ("I didn't have any authority. The only thing I was able to do was take the data and plug it into the criteria.")).) Other evidence indicates NMMs had

discretion to request additional information, collaborate and brainstorm with a Medical

Director, and recommend claims for approval even when the criteria were not met.

(Boral Dep. at 1–2, 6; Vialpando Dep. at 22; Mar. 18, 2024 Tr. at 108–112 (Smith

testifying that if the guidelines were unclear, "we could reach out to the provider for that

information"); Mar. 18, 2024 Tr. at 184–86 (Dr. Moore testifying that occasionally an

NMM would present a case to him for approval even though the criteria were not met).)

Ultimately, the witnesses disagree over whether reviewing authorization requests for

Anthem is or is not a black-and-white process. (*Compare* Hackett Dep. at 33 ("[I]n

reviewing cases with Anthem . . . its black and white,") *with* Boral Dep. at 6 (stating that

reviewing criteria is not always "black and white").)

Finally, when the question is whether NMMs exercised judgment or discretion, the

testimony goes in two different directions. For example, Hackett testified that NMMs

cannot use clinical judgment when making determinations. (Hackett Dep. at 33.)

Witnesses such as Gore agreed that Anthem prohibited her "from exercising independent

clinical judgment," but also stated that NMMs were allowed to use clinical and medical

judgment in many ways. (Gore Dep. at 32.) Other evidence shows use of judgment and

discretion, such as Gore's statements that she complied with the guidelines which

required use of medical judgment and that she "worked with the medical directors in

interpreting appropriateness of care." (*Id.* at 28–33.) Similarly, Dr. Moore testified that

NMMs had to use their best clinical judgment to find relevant parts of the case, to attach

the correct guideline to a request, and to distill medical information in large, 200-page

case files. (Mar. 18, 2024 Tr. at 184–85, 194–95.)

The Court finds that the evidence presented by the parties demonstrates "a genuine issue of material fact as to whether Plaintiff[s] exercised discretion and independent judgment in [their] primary duties" and thus the Court is precluded from granting summary judgment for or against Plaintiffs or Defendants on the learned professional exemption. *See Infante v. Jewish Cmty. Servs. of S. Fla., Inc.*, No. 24-20968-CIV, 2024 WL 5088321, at *9 (S.D. Fla. Dec. 12, 2024) (holding that summary judgment for or against the plaintiff or defendant on the learned professional exemption was precluded); *Sigida v. Munroe Foods 2 LLC*, No. 1:14-cv-3968-RWS, 2016 WL 7239952, at *5 (N.D. Ga. Dec. 15, 2016) (denying both cross motions for summary judgment given competing evidence on whether an employee exercised discretion); *Williams*, 809 F.3d at 109. Given the genuine dispute of material fact on the learned professional exemption, the Court will deny the motions for summary judgment as to that issue. *See Anderson*, 477 U.S. at 248.

### ii. **The Administrative Exemption**

As described above, overtime provisions in the FLSA do not apply to employees working in an administrative capacity. 29 U.S.C. § 213(a)(1) ("The provisions of sections 206 . . . and 207 of this title shall not apply with respect to . . . any employee employed in a bona fide executive, administrative, or professional capacity.") For the administrative exemption to apply, an employer must prove that an employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance" and also that the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of

the employer or the employer's customers." 29 C.F.R. § 541.200; *Morrison v. Cnty. of Fairfax*, 826 F.3d 758, 762 (4th Cir. 2016).

For the same reasons the Court found there is a genuine issue of material fact as to whether Plaintiffs consistently exercised discretion and judgment to satisfy the learned professional exemption, the Court finds that there is a genuine issue of material fact whether Plaintiffs' primary duty included the exercise of discretion and independent judgment for purposes of the administration exemption. *See Cameron v. Abercrombie & Fitch Co.*, No. 2:10-cv-631, 2012 WL 4057240, at *9 (S.D. Ohio Sept. 14, 2012) (finding summary judgment was precluded on the question of whether employee exercised judgment and discretion). Although the learned professional and administrative exemptions are distinct on the question of whether employees exercised judgment, those differences are not dispositive under the facts in this case. Given the competing evidence as to whether the Plaintiffs exercised independent judgment, Defendants cannot prove, as a matter of law, that the administrative exemption must apply here. Therefore, Defendants' Motion for Summary Judgment will be denied. *See supra* Part III.B.i.

However, the facts material to whether Plaintiffs' primary duties were "directly related to the management or general business operations of the employer or the employer's customers" are not genuinely in dispute.[2] *See Morrison*, 826 F.3d at 762

---

[2] Defendants do not dispute that the Plaintiffs' primary duty was assessing and/or approving requests for medical services. (ECF No. 108 at 12.) While Defendants dispute peripheral facts, those facts are either not material or are insufficient to overcome summary judgment. For example, Defendants disagree that NMMs are "entry-level," that their job performance is "based solely on productivity," that they "regularly reward or discipline NMMs," and that Anthem "pressure[s]" NMMs. (ECF No. 119 at 10–11.)

(quoting 29 C.F.R. § 541.200).  To meet the business operations requirement of the

administrative exemption, an employer must prove that an employee "perform[s] work

directly related to assisting with the running or servicing of the business, as

distinguished, *for example, from working on a manufacturing production line* or selling a

product in a retail or service establishment." *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d

111, 123 (4th Cir. 2015) (emphasis in original) (quoting 29 C.F.R. § 541.201(a)).  Types

of work that fall within the exemption include "work in functional areas such as tax

. . . auditing; insurance; quality control; . . . legal and regulatory compliance; and similar

activities."  29 C.F.R. §541.201(b).  On the other hand, work that falls outside the

exemption is "production-type" work, such as serving on a manufacturing production line

or selling a product. *Calderon*, 809 F.3d at 123–24.

     Applying these principles, the Fourth Circuit has held that horse racing officials

fell outside the exemption because their employer produced live horse races and the

employees' duties consisted of "the day-to-day carrying out of [their employer's] affairs

to the public, a production-side role." *Desmond v. PNGI Charles Town Gaming, L.L.C.*,

564 F.3d 688, 694 (4th Cir. 2009).  Similarly, the Fourth Circuit has stated that insurance

investigators were "in no way part of the management of GEICO and do not run or

service the general business operations.  Rather, by assisting the Claims Adjusters in

processing the claims of GEICO's insureds, the Investigators' duties simply consist of the

day-to-day carrying out of GEICO's affairs' to the public." *Calderon*, 809 F.3d at 124

(cleaned up).  Consequently, the Fourth Circuit has recognized that an "administrative-

production dichotomy" is a useful analytical tool to evaluate whether a job duty properly falls under the administrative exemption. *See id.* at 123–24.

Defendants argue that "[n]urses working in the NMM positions satisfy the 'business operations' element [of the administrative exemption] because they served Defendants' business and its customers rather than producing or selling its product." (ECF No. 119 at 34.) For example, Defendants have contracts with the Commonwealth of Virginia and with private entities for various types of insurance. (*Id.* at 35.) Those contracts require Defendants to follow certain guidelines and criteria when reviewing authorization requests. (*Id.*) Likewise, Defendants' NCQA accreditation requires Anthem to meet consistency standards. (*Id.*) Defendants contend that an NMM's role is essentially that of a compliance officer to ensure these guidelines, criteria, and accreditation standards are met. (*Id.* at 35 ("RNs working in NMM roles service Defendants' business by ensuring that Defendants comply with those contractual rules, accreditation criteria, and Medicaid regulations.").)

Plaintiffs argue that NMMs "are non-exempt production workers who produce the very service that Defendants provide to its customers." (ECF No. 98 at 34–36.) Specifically, Plaintiffs explain, "Defendants provide health insurance plans and utilization management services (including utilization review) to the marketplace and Plaintiffs' job is to conduct utilization reviews." (*Id.*) In short, Plaintiffs argue that NMMs cannot be exempt because they are public facing, front-line workers who carry on Anthem's day-to-day affairs rather than the management of operations for Defendants or Defendants' customers. (*Id.*)

The record shows that NMMs are far more similar to employees that run day-to-day affairs rather than those that manage internal operations of a business. The NMMs did not manage staff, and they did not have influence over policies or operations within Defendants' organizations or within the organizations of their customers. While NMMs' decisions play a part in customer operations by determining insurance payment authorizations, NMMs do not engage in direct business management activities. NMMs are not directly involved in managing, operating, or otherwise running the customers' businesses. NMMs' work product is their response to an authorization request. The NMMs have no involvement after that point.

Even when viewing the facts in Defendants' favor, Defendants have provided insufficient evidence to prove that the NMMs' primary duty is the performance of work "directly related to the management or general business operations of the employer or the employer's customers." *See* 29 C.F.R. § 541.200. Thus, Defendants cannot prove that Plaintiffs fall under the administrative exemption. Under similar facts, other district courts have found that the administrative exemption was not satisfied. *Learing v. The Anthem Companies, Inc.*, 722 F. Supp. 3d 929, 943 (D. Minn. 2024) ("The record reflects that NMMs operate more similarly to production line workers than to business consultants who manage or service the customer's business."); *Rego*, 367 F. Supp. 3d at 855 (finding that employees' work as utilization reviewers did not directly relate to the management or general business operations of a managed care company). Consequently, the Court will grant Plaintiffs' Motion for Partial Summary Judgment as to Defendants' administrative exemption defense.

### iii. <u>The Good Faith Defense</u>

An employer who violates the FLSA is generally liable for unpaid overtime wages and liquidated damages equal to the unpaid overtime compensation. 29 U.S.C. § 216(b); *Carrera v. E.M.D. Sales Inc.*, 75 F.4th 345, 353 (4th Cir. 2023), *rev'd on other grounds*, 604 U.S. 45 (2025). However, 29 U.S.C. § 260 gives the court discretion to limit or deny liquidated damages where the employer is found to have acted in good faith and had reasonable grounds to believe his act or omission did not violate the FLSA. *See* 29 U.S.C. § 260 ("[I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] the court may, in its sound discretion, award no liquidated damages").

Plaintiffs seek a ruling from this Court that Defendants, as a matter of law, did not act in good faith in classifying Plaintiffs as employees exempt from FLSA's overtime provisions. (ECF No. 98 at 38–39.) In response, Defendants contend that, while they provided sufficient evidence to support a *prima facie* good faith defense, a ruling from the Court on this issue would be premature at this stage in the case. (ECF No. 119 at 39.)

As other district courts have found, "where no FLSA violation has been conclusively established, consideration of whether an employer acted in good faith in making such violation is premature." *Rehberg v. Flowers Baking Co. of Jamestown, LLC*, 162 F. Supp. 3d 490, 515 (W.D.N.C. 2016); *Regan v. City of Charleston*, 131 F. Supp. 3d 541, 558 (D.S.C. 2015) ("[B]ecause the City's liability is still an open question, the Court declines to reach and decide the City's alternative arguments related to its

§ 260 affirmative defense."); *Kelley v. TaxPrep1, Inc.*, No. 5:13–cv–451–OC–22PRL,

2015 WL 4488401, at *3 (M.D. Fla. July 22, 2015) ("Again, because no FLSA violation

has been established (or otherwise conceded), consideration of the issue of liquidated

damages, and thus the associated affirmative defense of good faith, is premature.");

*Switzer v. Wachovia Corp., No. CIV.A. H–11–1604*, 2012 WL 3685978, at *5 (S.D. Tex.

Aug. 24, 2012) ("Absent a violation of the FLSA, there can be no willful violation.").  As

stated above, Defendants' liability for the alleged FLSA violations has not yet been

established.  Consequently, the Court concludes that it would be premature at this stage to

rule on Defendants' good faith defense to liquidated damages.

## IV.  CONCLUSION

For the aforementioned reasons, Defendants' Motion to Decertify the

Conditionally Certified Collective (ECF No. 105) and Motion for Summary Judgment

(ECF No. 107) will be denied.  Plaintiffs' Motion for Partial Summary Judgment (ECF

No. 97) will be denied as to the learned professional exemption and the good faith

defense, and will be granted as to the administrative exemption.

An appropriate Order will accompany this Memorandum Opinion.

Henry E. Hudson
Senior United States District Judge

Date: Apr.1 2, 2025